MAE ALICE LOCKWOOD v. JOHN E. LOCKWOOD and Wife.[1]

April 13, 1897.

Nos. 10,290—(243).

**Married Woman—Alienation of Husband's Affections.**
A married woman can maintain an action against persons who wrongfully entice her husband from her and alienate his affections, and thereby cause a separation between them.

**Same—Damages—Sufficiency of Evidence.**
Evidence considered, and *held* sufficient to justify a verdict for the plaintiff, and that the amount of the verdict is not excessive.

Appeal by defendants from an order of the district court for Hennepin county, Elliott, J., denying a new trial. Affirmed.

*Koon, Whelan & Bennett,* for appellants.

The question in this case is not whether in Minnesota a married woman can maintain an action in her own name for enticing away her husband. Certain facts in this case differentiate the question here from that question. (1) After plaintiff's marriage the defendants gave her a home and asylum. (2) At the time of the alleged enticement plaintiff and her husband were members of defendants' household. (3) While subjected to ill treatment there by both her husband and his

1 Reported in 70 N. W. 784.

parents, plaintiff left their house and her husband's bed and board. (4) He did not follow her, but continued to live at home. (5) Plaintiff continued to live apart from her husband, he meantime furnishing her with separate support. (6) Her action is for his abandonment of her induced by his parents. (7) Her action is against his parents. By reason of these facts plaintiff cannot maintain this action, even if such a right of action belongs to a married woman under the Minnesota law.

No duty was imposed by law upon these parents to furnish plaintiff a home or asylum. Pollock v. Pollock, 9 Misc. (N. Y.) 82, 29 N. Y. Supp. 37; Young v. Young, 8 Wash. 81, 35 Pac. 592. If the ill treatment of plaintiff, which she received at defendants' hands, was the sole cause of her abandonment of her husband, this action will not lie. The parents of her husband are not liable in a suit for alienating the affections of their son when they, without provocation, drive her away from their home and permit him to remain. They have a perfect right to drive her away. Young v. Young, supra. The motives of a parent in counseling a married child in his domestic affairs are presumed to be good, until the contrary is made to appear. If the parent act in good faith no suit lies against him. Reed v. Reed, 6 Ind. App. 317, 33 N. E. 638; Hutcheson v. Peck, 5 Johns. 195; Tucker v. Tucker, 74 Miss. 93, 19 South. 955; Smith v. Lyke, 13 Hun, 204; Bennett v. Smith, 21 Barb. 439; Huling v. Huling, 32 Ill. App. 519.

The complaint must allege that the parent's act was done maliciously, and the evidence must positively show malice or it must necessarily be deduced from the circumstances. Reed v. Reed, supra; Westlake v. Westlake, 34 Oh. St. 621; Tucker v. Tucker, supra; Hutcheson v. Peck, supra. This case does not contain any positive evidence of malice or of circumstances from which malice must necessarily be deduced. The presumption of fact, that the parent acted only for the best interest of his child, must be clearly overcome by plaintiff by weight of evidence. Pollock v. Pollock, supra. Charge of Judge Mitchell in Huot v. Wise, 27 Minn. 68, 6 N. W. 425; MS. record of case.

Apart from the distinguishing features of this case, plaintiff has no right of action. Kroessin v. Keller, 60 Minn. 372, 62 N. W. 438; 2 Cooley's Blackst. 143; Van Arnam v. Ayers, 67 Barb. 544; State v. Pulle, 12 Minn. 99 (164); Pyeatt v. Powell, 10 U. S. App. 200, 2 C. C. A. 367, 51 Fed. 551; Doe v. Roe, 82 Me. 503, 20 Atl. 83; Duffies v. Duffies, 76 Wis. 374, 45 N. W. 522. Reason and natural justice require

that an action by a married woman against a third person shall not lie, so long as her husband is an incompetent witness in the case. G. S. 1894, § 5662. G. S. 1894, §§ 5530, 5531, 5159, do·not give any such right of action to a married woman.

The cases of Lynch v. Knight, 9 H. L. 577, and of Westlake v. Westlake, 34 Oh. St. 621, were both actions for slander and were decided by a divided court. The ecclesiastical law of England was no part of the common law and has never been adopted here. Any argument from the ecclesiastical law, as attempted in Weldon v. Weldon, L. R. 9 P. D. 52, and Segelbaum v. Segelbaum, 39 Minn. 258, 39 N. W. 492, is inept. The fallacy in the cases of Warren v. Warren, 89 Mich. 123, 50 N. W. 842, and Bennett v. Bennett, 116 N. Y. 584, 23 N. E. 17, was in holding (1) that the common law gives a wife a legal right to the consortium of her husband, and (2) that the common law ever gave her, alone and independent of her husband, a remedial right for breach of any right of person. Want of right and want of remedy are the same thing. 1 Bacon, Abr. 66; Ashby v. White, 2 Ld. Raym. 938. Under the common law of this state, as modified by statute, a married woman has not this right of action, and any construction of the existing law giving her such right amounts to judicial legislation. Althen v. Tarbox, 48 Minn. 18, 50 N. W. 1018; Kroessin v. Keller, 60 Minn. 572, 62 N. W. 438; Pett-Morgan v. Kennedy, 62 Minn. 348, 64 N. W. 912; Gillespie v. Gillespie, 64 Minn. 381, 67 N. W. 206.

Under G. S. 1894, § 5662, plaintiff was an incompetent witness without the consent of her husband. Every word of her testimony to prove her separate action against defendants established the right of joint action, which, in principle, she had against defendants and against her husband. In applying a statute to new conditions or to a new class of cases, evidently not within its purview when enacted, courts will so construe it as to carry out the evident intent of the statute and preserve justice.

*Welch, Hayne, Hubachek & Conlin,* for respondent.

The cases cited by opposing counsel that parents may advise a married child recognize the rule with proper limitations. Schouler, Dom. Rel. § 41. The right of the parent is confined to giving good advice honestly. For an exception see Williams v. Williams, 20 Colo. 65, 37 Pac. 614; Hutcheson v. Peck, 5 Johns. 196. In Young v. Young, 8

Wash. 82, 35 Pac. 592, the plaintiff was the wife and lived at the home of her husband's parents. It appears from the opinion in that case plaintiff had been in no wise maltreated while living there, and there was no direct evidence that her husband had ever refused to live with her, or that the appellants had ever undertaken to induce their son to abandon his wife. The right of the parent to advise his child is recognized when the necessity of the situation justifies such action by the parent. Smith v. Lyke, 13 Hun, 204; Tucker v. Tucker, 74 Miss. 93, 19 South. 955.

Van Arnam v. Ayers, 67 Barb. 544, was overruled in Bennett v. Bennett, 116 N. Y. 584, 23 N. E. 17, and disregarded in Baker v. Baker, 16 Abb. N. C. 293. The opinion in the Baker case proves the fallacy of appellants' contention that loss of the wife's services is the gist of the action. See Bigelow, Torts, 153; Rinehart v. Bills, 82 Mo. 534. Wisconsin, Maine, New York (but see Bennett and Baker cases, supra,) and Indiana (but see Haynes v. Nowlin, 129 Ind. 581, 29 N. E. 389) are the only states which have ever denied to the injured party the right of action for alienation of her husband's affections. Clow v. Chapman, 125 Mo. 101, 28 S. W. 328; Williams v. Williams, 20 Colo. 51, 37 Pac. 614; Hodgkinson v. Hodgkinson 43 Neb. 269, 61 N. W. 577; Foot v. Card, 58 Conn. 1, 18 Atl. 1027; Nichols v. Nichols, 134 Mo. 187, 35 S. W. 577; Warren v. Warren, 89 Mich. 123, 50 N. W. 842; Lynch v. Knight, supra; Holmes v. Holmes, 133 Ind. 386, 32 N. E. 932. Bennett v. Bennett, supra; Jaynes v. Jaynes, 39 Hun, 40; Waldron v. Waldron, 45 Fed. 315; Bassett v. Bassett, 20 Ill. App. 543; Haynes v. Nowlin, 129 Ind. 581, 29 N. E. 389; Wolf v. Wolf, 130 Ind. 599, 30 N. E. 308; Postlewaite v. Postlewaite, 1 Ind. App. 473, 28 N. E. 99; Reed v. Reed, 6 Ind. App. 317, 33 N. E. 638; Breiman v. Paasch, 7 Abb. N. C. 249; Baker v. Baker, 16 Abb. N. C. 293; Warner v. Miller, 17 Abb. N. C. 221; Churchill v. Lewis, 17 Abb. N. C. 226; Westlake v. Westlake, 34 Oh. St. 621; Mehrhoff v. Mehrhoff, 26 Fed. 13. G. S. 1894, § 5530, is conclusive on this point, whether at common law the wife had or had not a right of action.

BUCK, J. This action was brought against John E. Lockwood and Mattie Lockwood, husband and wife, to recover damages for the alleged alienation by them of the affections of Edwin L. Lockwood, their son, from his wife, the plaintiff, Mae Alice Lockwood, and for her

consequent loss of his support, protection, and society.    The answer
of the defendants was a general denial, and upon trial to a jury the
plaintiff had a verdict for $15,000; and defendants' motion for a new
trial having been denied, they bring this appeal.  All the parties
have resided in the city of Minneapolis for many years.    At the time
of plaintiff's marriage she was 30 years old, and her husband's age
was 35.    They were married on November 8, 1894, and the separa-
tion took place on the 25th or 26th day of September, 1895.    The de-
fendant John E. Lockwood is the president of the Union Iron Works,
in the city of Minneapolis, and the son, Edwin L. Lockwood, is the
secretary and treasurer of the company.    The elder Lockwood lives
in a very nice home, and has horses and carriages, and everything
necessary to live comfortably.

The marriage of Edwin L. Lockwood and this plaintiff took place at
the home of a mutual friend without the knowledge of the defendants.
The plaintiff's husband has always lived with his parents.    On the day
of his marriage he announced it in a note written to his parents,
and the father, by note, invited him and his wife to come to his home
and live; stating therein, also, that he was surprised, but pleased,
to hear of their marriage, and that he always had great respect for
the plaintiff.    The next day the plaintiff and her husband went to de-
fendants' house to reside, and resided there until their separation in
the month of September, 1895.

Previous to the time of her marriage, plaintiff had supported herself
by her own labor as a dressmaker, and for several weeks at a time,
in the spring and fall, for three years previous to her marriage, had
worked as dressmaker for the defendants at their home, where she
first met her future husband.    The character and reputation of the
plaintiff stand unchallenged.    Nowhere, either in the record or in the
argument of counsel, is it assailed in the slightest degree.    Therefore
want of good character formed no basis for the unfortunate family
difficulties resulting in the bringing of this action, and which the de-
fendants' counsel strenuously contends cannot be maintained by the
plaintiff, as wife of Edwin L. Lockwood, even if the conduct of the de-
fendants was the primary cause of alienating his affections from plain-
tiff, and depriving her of his support, protection, and society.

1. At common law the husband had a right of action for damages
against third persons for alienating the affections of the wife, enticing

her away, and depriving him of her society; but whether the wife had this right at common law against third persons for alienating the affections of her husband, enticing him away from her, and thus depriving her of his society, protection, and support, we do not deem material in this case. It is ruled in some jurisdictions that she has no such right, while in others it is held that she may maintain such action upon common-law principles. The question has never been passed upon by this court either as a common-law or statutory right. But upon an examination of our statutes we find that many of the disabilities under which married women labored at common law have been removed. The letter and spirit of these laws tend strongly to place the wife upon an equality with the husband as respects her property and personal rights. If, therefore, there is any authority under the statute to enforce her rights in regard to such matters by proceedings in her own name, independently of her husband, we need not seek in the principles of the common law for authority to uphold her right to maintain this action. Equality of right ought to give equality of remedy. If there are exceptions, we see no grounds upon which they should be applied in a case of this kind, where the rights and remedies of the parties should be reciprocal. In the case of Warren v. Warren, 89 Mich. 123, 127, 50 N. W. 842, it is well said by the court:

"There has never been any reason urged against the right of the husband to sue for the loss of the consortium of his wife. And if, as shown, the wife is now, under either the liberal letter or spirit of our marriage laws, entitled, as of her own property, to the damages arising from her personal injuries,—the injuries to her body or mind,—there can be no good reason why she cannot sue for and recover damages for the loss of the consortium of her husband that does not equally and as well apply to the suit of the husband on account of the loss of her society. The wife is entitled to the society, protection, and support of her husband as certainly, under the law, and by moral right, as he is to her society and services in his household."

Our constitution (article 1, §.8) provides that every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property, or character. Unless there is some plain provision of law to the contrary, a married woman should receive the same protection of all her rights as a woman which her husband does as a man; and for any injury sustained to her reputation, person, property, character, or any natural right, she should have the same right to appeal, in her own name alone, to the courts of law or

67 M.—31

equity, for redress and protection, that her husband has to appeal in his name alone. What rights has he to protect? His reputation, person, property, character, and his natural rights. She has the same right. Is her right to the conjugal society of the husband one that comes within the letter and spirit of existing laws? In the case of Foot v. Card, 58 Conn. 1, 8, 18 Atl. 1027, it is said:

"So far forth as the husband is concerned, from time immemorial the law has regarded his right to the conjugal affection and society of his wife as a valuable property, and has compelled the man who has injured it to make compensation. Whatever inequalities of right as to property may result from the marriage contract, husband and wife are equal in rights in one respect, namely, each owes to the other the fullest possible measure of conjugal affection and society; the husband to the wife all that the wife owes to him. Upon principle, this right in the wife is equally valuable to her, as property, as is that of the husband to him."

The husband's right of action does not rest upon the ground of loss of service, but upon the loss of conjugal society or consortium arising by virtue of the marriage contract. Bigelow, Torts, 153. Jaynes v. Jaynes, 39 Hun, 40, 43, in which it is also said that such a right was a property right, but,

"If it be not property in the sense in which the word 'property' is used in the statute cited, it is a personal right; and as the statute extends to all injuries, whether to property, person, or character, it seems to be sufficiently comprehensive to embrace an injury to the right in question."

See, also, Warren v. Warren, 89 Mich. 123, 50 N. W. 842, to the same effect. In Bennett v. Bennett, 116 N. Y. 584, 23 N. E. 17, it was held that such an interference with the rights of the wife was a violation of her natural rights. We approve of these decisions as being sound law as well as good sense.

To a great extent, the statute has broken down the legal fiction that the husband and wife were one, and hence, in actions of wrong done to her property or person, she is placed upon the same plane as the husband. Under our statutes relating to the rights of married women, they can own all classes of property, and receive the rents and profits of the same, free from the control of the husband. Actions may be brought by and against a married woman in relation to her sole property in the same manner as if she was unmarried. She may also maintain actions for personal wrongs done her, and the damages

received would belong to and be her personal property. She is not liable for the debts of her husband, nor is the husband liable for any debts or contract of the wife, except for necessaries furnished her after marriage. The whole tenor of our statute relating to the rights of a married woman shows the tendency to abrogate the common-law unity of husband and wife, and, if the common law ever stood in the way of her maintaining an action of this kind, she has, by statutory enactments, been emancipated from its thraldom, and stands upon grounds more in accord with enlightened thought and natural justice. Upon reason, a wife ought to be entitled to maintain such an action.

"To entice away or to corrupt the mind and affections of one's consort is a civil wrong, for which the offender is liable to the injured husband or wife. * * * The gist of the action, however, is not the loss of assistance, but the loss of the 'consortium' of the wife or husband, under which term is usually included the person's affection, society, or aid."

Bigelow, Torts, 153.

In note 2, p. 267, of Cooley on Torts (2nd Ed.), the author says:

"We see no reason why such an action should not be supported where by statute the wife is allowed, for her own benefit, to sue for personal wrongs suffered by her; and it is held she may maintain an action in her own name for alienating the husband's affections and causing a separation,"—citing authorities.

As long as the plaintiff kept her marriage contract, she was entitled to the husband's conjugal society, and to her marital rights under that contract. If the husband violated this contract, the wife had a right to know the reason therefor. Her marriage gave her this right. She was entitled to his companionship, affection, care, and protection. She broke no vows of her own. Faithful in her marriage relations, she found herself deserted in early married life by a husband through some malign influences; and, cast upon the world without a husband or home, she appeals to the law for redress. Why should she not have a right of action for the wrong she thus suffers as well as the husband if her affections had been alienated from him? His society was of value to her, springing from the marriage contract, and from it she was entitled to the protection of the law. For the injury which she has suffered she has a remedy, and that remedy consists in her right to maintain an action at law against the prime movers in perpetrating this wrong against her marital rights. In support of these views, see Clow

v. Chapman, 125 Mo. 101, 28 S. W. 328; Haynes v. Nowlin, 129 Ind. 581, 29 N. E. 389, overruling Logan v. Logan, 77 Ind. 558; Bennett v. Bennett, 116 N. Y. 584, 23 N. E. 17; Warren v. Warren, 89 Mich. 123, 50 N. W. 842; Foot v. Card, 58 Conn. 1, 18 Atl. 1027; Price v. Price, 91 Iowa, 693, 60 N. W. 202.

It is further contended by the defendants that whatever they said or did in relation to the separation of the husband and wife, or their domestic difficulties between them, was merely the exercise of a parental privilege of advising them, and that the law presumes the motive of the parents in such case to be good until a contrary motive is made to appear; and that when such advice is given in good faith and results in a separation the act does not give the injured party a right of action against the parents. Conceding, without deciding, such to be the law, yet such relationship and conduct on the part of the parents would not excuse willful, malicious, and deliberate acts upon their part which result in or contribute to the separation. The plaintiff's husband was a man of mature years when he married plaintiff, and had known her for several years previous to the marriage, and the defendants had also known her quite intimately for at least three years prior to the time of such marriage, and at that time seemed to be pleased that their son had married the plaintiff; and during the time they lived together as husband and wife her conduct had been exemplary, and has so continued. What motive, then, inspired the defendants in the course of conduct which they have pursued towards this plaintiff? There were no serious domestic difficulties between plaintiff and her husband previous to the time of their separation. No question of immorality, property rights, or social discord leading to their separation is to be found in the record. On the contrary, we find a husband separating from a pure wife, after living with her only ten months, giving no reason or excuse for his faithless conduct, leaving her homeless and at first penniless, neither seeking nor permitting any reconciliation, and not having either the courage or manliness to defend her when abused or insulted. Such conduct needed explanation. The jury doubtless found it in the conduct of the defendants. It is true they denied it generally and specifically, but the jury found against them and for the plaintiff.

But the case was not tried upon the theory that the defendants were exercising a parental right in advising the son as to any domestic trou-

bles, or that they had attempted any reconciliation between the plaintiff and her husband.    The defendant John E. Lockwood testified:

"We lived the same as any family.    Everything was pleasant and agreeable in the family, and it was one family in reality.    There were no jars and no disagreeable talk, or anything of the kind, during the whole time that I knew the plaintiff, not one, from the time that she was my son's wife.    From the time I first knew her up to that time, everything was pleasant and agreeable at the house."

He again testified that on September 26, 1895, when plaintiff, in her distress, complained to him of her husband's conduct on that and the previous day, he answered her as follows:

"Mae, I don't know anything about your affairs.    I am old enough and I know enough not to interfere between a man and his wife."

The defendant Mattie Lockwood testified that there had been no trouble, fuss, or disagreement of any kind until September 25, except a little difference of opinion about a mutual friend which was by her regarded as of little consequence.    It quite conclusively appears from the record that there were no domestic troubles or difficulties between plaintiff and her husband which required any parental advice from the defendants, and as none was needed none was given; and hence the contention of counsel that the defendants in this case had a legal right to give such advice to their son is farfetched and without any grounds for the application of the rule, if such a one exists in law.

2. The question now arises, was the conduct of the defendants, as developed by the evidence, of such a character and sufficient to justify the jury in finding that it had caused the alienation of the affections of Edwin L. Lockwood from his wife, this plaintiff, and his consequent separation from her, and her loss of his conjugal society?    The plaintiff in her complaint, in addition to certain other allegations therein, charges as follows:

"That soon after said marriage, and after said Edwin L. Lockwood had taken this plaintiff to said defendants' home, and made the same his home and the home of this plaintiff, for the reason and as hereinbefore alleged, and at once after said defendants formed said agreement and conspiracy as hereinbefore alleged, said defendants, by reason of said agreement and said conspiracy, and to execute and carry out the same, jointly and severally, wrongfully, maliciously, unlawfully, and wickedly behaved and conducted themselves continuously until September 26, 1895, towards this plaintiff in an unkind, unsociable, cruel, and inhuman manner, thereby gradually undermining and destroying this plaintiff's happiness, peace of mind, and health, said

conduct and behavior of said defendants towards this plaintiff continually growing worse and more cruel; and by reason thereof said plaintiff's health and happiness became gradually more undermined and destroyed, until on the 26th day of September, 1895, when, solely by reason of said conduct of said defendants towards her, in conjunction with the conduct of said Edwin L. Lockwood, her husband, towards her, as hereinafter alleged, this plaintiff's health was entirely destroyed, and she was at said time, in her said home, and in the home of her said husband and of these defendants, dangerously sick, confined to her bed, and under the care of her physician.

"That during the whole time during which said defendants behaved themselves towards this plaintiff as hereinbefore alleged, which produced the effects upon this plaintiff as hereinbefore alleged, by reason of, in pursuance of, and in execution of said agreement and conspiracy, said defendants wrongfully, wickedly, unlawfully, and maliciously, jointly and severally, and continuously until the 26th day of September, 1895, enticed, induced, begged, persuaded, and urged said Edwin L. Lockwood to deprive this plaintiff of all the things which, as hereinbefore alleged, it was the duty of said Edwin L. Lockwood to furnish to this plaintiff as his wife, and to abandon and desert her, and to live apart from her, and to refuse to live with her, and to neglect her and drive her away from his and her said home and the home of these defendants, and to compel her to continuously remain away from her said home, and for himself to remain and live with themselves alone, as he had done before said marriage, as hereinbefore alleged."

According to the plaintiff's testimony, the first open exhibition of anger on the part of defendants to plaintiff was when her husband bought an expensive ring for her, in the month of March, prior to the time of their separation. At that time defendants treated her coldly, and did not speak to her that day. Soon after, Mattie Lockwood made some criticisms upon a friend of plaintiff, whom she defended, and thereupon Mattie Lockwood jumped up from a chair near the table where she was sitting, went near the plaintiff, and shook her fist in the plaintiff's face, and did not speak to her or her husband for two days. When plaintiff expressed regret that anything unpleasant had taken place between them, and that, rather than have such trouble, she thought she and her husband had better go by themselves, the defendant Mattie Lockwood, in the presence of all the parties, charged plaintiff with trying to separate her husband from his people, to drag him down and take him away from their beautiful home, and that plaintiff was the most ungrateful person she ever knew.

Plaintiff further testified that from that day the defendants began to treat her with perfect disdain; that they would never ask her to

go out to ride with them, and would never offer her the carriage; that they would go to her husband about everything, and make a fuss about everything she purchased; that every attention showed her by her husband made them angry, and when he was not present they would openly insult her, and did not wish to know anything about her or her friends; and that when she and her husband started on a pleasure trip to Boston they did not bid them good-bye, and that Mattie Lockwood was very angry about their going, and charged plaintiff with being responsible for her husband's taking the trip; and that she did not welcome them on their return.

On September 26, after Edwin L. Lockwood had left the house in anger towards plaintiff, and without any apparent cause, the plaintiff had an interview with the defendant Mattie Lockwood, and plaintiff testified that the following proceedings took place between them:

"Q. You may state the conversation you had with her." "A. I said: 'Mother, what does this mean? Has Ned gone crazy?' 'Why,' she says, 'haven't you ever heard of a husband and wife separating?' 'Yes,' I said, 'but those were cases where there was trouble between the husband and wife; not where the husband had to live in a home, and the wife was turned out.' And she says: 'This is Eddie's home, and I am miserable with you here. You are sick half of the time, and you don't seem to be happy here.' And I said: 'Happy! How can any one be happy, in the manner in which I have been treated in this house?' And she says: 'If I had been you, under the circumstances in this house, I would have acted more independent, and gone long ago.' She says: 'Well, Mae, under the circumstances, if I had been you, I would have acted more independent, and gone long ago.' And I said: 'Ned is my husband, just the same; and, if I go, he will have to go with me.' And she said: 'Your husband only as the law makes him support you. We know he will be obliged to support you, but he will only be obliged to give you necessaries; and, if you want anything more, you will have to go to work.' And I said: 'If he stays, I will have to stay.' And she says: 'Why, he has cast you from him. Your rooms are already separate. You can never go any place together, and we are going to tell everybody right away that you are separated. And just think what will be our relations if you stay; when you come to the table, no one will speak to you, and, if you go to having any more of your imaginary sickness, no more doctors will come here to see you and run up bills for Eddie to pay. I can say to you that this is my house, and you can simply stay here until you find a boarding place and decide what to do. There is no use of my discussing the matter any further, as it was all decided last night between Eddie and us.' That is what she said. * * *

"Mr. Welch: What was that last that she said? A. She said that it was all decided last night, and nothing that you can do or say can

make it any different. Eddie is to live with us. Q. State any further conversation. A. She says: 'You know you can't get a divorce. There will be no publicity about it, and, if I were you, I would go out of the city.' And I said: 'This from you! You, a mother and a Christian woman!' I said: 'This from you, a mother and a Christian woman!' She was very angry, and said she would go to the kitchen, where she could be protected from any such crazy talk. I said: 'What will become of me? I am in no condition to be turned out,' and she says: 'Who cares anything about your condition, or you, any way? You are getting your pay now for influencing Eddie to marry you without our consent,' she says, 'and the sooner you get out of this house the better.' She says, 'The most unhappy hour in our life was when we heard Eddie was married.' I pleaded with her, and tried in every way—

"Q. Proceed and state anything further. A. I told her that my husband was not himself, that he was drinking, and that he didn't realize what he was doing. And she says: 'I guess you will find out he is himself, when you find out all he has done.' Then I tried to plead with her; if she had any influence over him, if she would not say something to him. And I said: 'It would not only ruin my life, but his.' And she said she guessed he would get along all right, that he got along all right before he ever saw me, and she guessed that he wished he had never even seen my picture, a great many times. Q. Well, was that substantially all that passed between you? A. It was. Of course, there was more to it. I went up to her and tried to plead with her, and she wouldn't have it at all, and pushed me away from her, and said she wanted to hear nothing more about it; that I was just setting her crazy with my talk. And I said, 'What do you think of me?' and she says, 'Oh, who cares anything about you;' and with that she went to the kitchen. * * * She also said,—here is one thing that I forgot,—in response to my pleading to her— I said I had no home and no place to go to, and I thought he was pledged to me and it was his duty; and she said she didn't see how I could expect him to do it. She says: 'It would be very different, Mae, if he had taken you from your home, or if you had anything to bring him; but you had nothing, and I don't see how you can expect him to take you, or even ask you.' With that, I asked her if my love for my husband was nothing, and if the wife had no rights; and she said, 'In some cases, but not in this.'

"Q. After that interview closed, you went up to your room? A. I went up to my room, and lay upon the bed a little while. I was perfectly exhausted, and was shaking so that I could hardly stand. I felt so weak I was perfectly overcome, and I lay down upon the bed, and didn't know what to do. Then I hastily threw myself into something. My one thought was to go to some human being, some one to say one kind word— Q. You left the house? A. Yes, sir. Q. How were you appareled. A. Just as I was in the morning, except that I changed my dress skirt and put on a little light wrap. The weather had turned very much colder. I didn't know that, of course, as it was

warm in the house; and I nearly froze, for I had on that day just a shirt waist and a skirt. Q. Where did you go? A. I got to the car and went over to the physician's, Dr. Roberts."

The conduct of the defendant John E. Lockwood was very much in the same line as that of his wife. Notwithstanding the letter which he wrote to plaintiff and her husband on the day of their marriage, he testified on the stand that he never liked the plaintiff; that the makeup of her jib was not right, and he never had any love or respect for her. Plaintiff was very sick the night of September 25,—unable to sleep at all, by reason of her husband's conduct and that of the defendants, the husband not going to her room when she was sick, nor did the defendants visit plaintiff that night or assist her in any way. The next morning, on going to the library, the defendants and her husband were there; and when she attempted to caress him he pushed her away, and the others, when spoken to, did not answer at first. Plaintiff said to defendant John E. Lockwood: "I appeal to you. What is the matter?" And he answered:

"My son can tell you after dinner what the matter is. He is of age now, and he was of age when he married you without my knowledge or consent. And, if he had asked my consent, he wouldn't have got it. I consider you [he used a profane word there] a fool and adventuress. If we can prevent it, my son won't live with you another day."

John E. Lockwood then asked plaintiff's husband if he was going to see his lawyer before he came to the office. Mattie Lockwood was present at this time. The plaintiff's husband soon after left the house, without bidding plaintiff good-by, and during the afternoon plaintiff also left defendants' house. No assistance was given plaintiff that day, although she was very sick with nervous chills. During all these times to which we have alluded, not a word of attempted reconciliation appears to have been uttered by these defendants or plaintiff's husband. It appears rather to have been a willful and deliberate attempt on the part of defendants to cause an alienation of Edwin L. Lockwood's affections for his wife, and, if possible, a separation between them, and to cause him to abandon and desert his wife.

This conduct on the part of the defendants was followed by an attempt on the part of the defendants, at the trial, to show by Dr. Roberts that, on September 26, plaintiff was crazy, evidently to break the force of her evidence against them. But their treatment of her on that occasion was so much at variance with his theory of insanity that

it may have had its influence, more or less, upon the minds of the jury. To charge plaintiff with being an adventuress, and threaten her with separation from her husband and consequent loss of his conjugal society, even if her mind was somewhat affected by the trying ordeal which she was passing through, constituted an element of wrongdoing which lay at the very foundation of the right of plaintiff to maintain this action.     In the absence of proof of any care, sympathy, or attempt at reconciliation on the part of defendants at such time, when her condition would the most strongly appeal to their sense of duty and justice, the jury doubtless considered the question of whether defendants' conduct was not malicious, and acted accordingly.

3. The next question relates to the admission of the plaintiff's evidence, and it is argued by defendants' counsel that such evidence was inadmissible, under G. S. 1894, § 5662.     That section has no application to the case under consideration.     The gist of this action is against third parties, for the wrong done by them in bringing about a separation between plaintiff and her husband.     It is true the conduct of the husband is involved, but the gravamen of the allegation in the complaint is that his misconduct was caused by the defendants as the moving parties in this wrongdoing.     While the husband may have been guilty of separating from and abandoning his wife, and thus perpetrating a great wrong, yet it may have been done entirely through the malicious conduct of the defendants.     The actual fact that he had left her, did not live with her or provide a home for her, and that she had entirely lost his conjugal society, were all actual, material facts in the case, to which she had a right to testify; and giving such testimony in an action against third parties does not come within the prohibition of section 5662, as being an examination against her husband, nor an examination as to any communication made by him to her during the marriage relation.     The testimony did not relate to conversations between the plaintiff and her husband, nor was she being examined in any action to which he was a party.

It is further contended by the appellants that the trial court erred in admitting the declarations of the plaintiff's husband, Edwin L. Lockwood, made to the witness Bishop about half past 2 o'clock on the afternoon of September 26, that he, Edwin L. Lockwood, had decided to separate from his wife.     The fact of such separation was made an issue by the pleadings, but the defendants did not, by their evidence

or any testimony introduced by them, undertake to show that the husband had not withdrawn his conjugal society from his wife. In fact, the testimony was so overwhelmingly conclusive upon this point, outside of this declaration, that, even if inadmissible, it would be error without prejudice. But was it error? The general rule is that the declarations of a person not a party to the suit are incompetent evidence, except under special or peculiar circumstances.

In Williams v. Williams, 20 Colo. 65, 37 Pac. 614, it was held by the supreme court of Colorado that such declarations made to the wife herself were admissible, but here they were made to a third person. While the husband was not a party to the suit, his own conduct, as influenced by that of the defendants, was directly in issue. The evidence was not offered to bind or affect the husband's interests or rights in any case where he was a party litigant, but to show an accomplished fact, resulting from the defendants' wrongful conduct or influence upon him in separating him from his wife. The evidence, in connection with that which we have quoted in this opinion in relation to the plantiff's husband separating from her, was proper to be submitted to the jury, as it was almost coeval with some of their acts of wrongdoing at the time of the separation, and might be properly regarded as a part of the res gestæ. Some authorities hold that the declarations of the husband in such actions as to the reasons for separation are admissible, but here the only declaration was that he had decided to separate from his wife, without giving any reasons for so doing. Baker v. Baker, 16 Abb. N. C. 293; Remsen v. Hay, 14 Wkly. Dig. 443.

Appellants' counsel further contends that it was error in the trial court to refuse defendants the privilege of rebutting this evidence by that of the husband himself. The answer to this contention is that they did not offer to rebut this declaration alone, but attempted to introduce the husband to testify against the wife generally, on any ground, which was excluded by the court. Moreover, he had strenuously, throughout the entire trial, opposed the wife's testifying to any statements or admissions of her husband, and they were excluded by the court at his request; and appellants' counsel expressly stated, when offering the husband as a witness, that he did not expect he could testify.

Another error assigned is that the trial court erred in admitting evidence of the plaintiff that the defendant Mattie Lockwood was averse

to plaintiff having children. If this defendant was scheming for a separation of her son from plaintiff, her attempt to prevent plaintiff having children by defendants' son would be proper, in showing the animus or motive in the plot to accomplish her purpose. Children constitute one of the strongest ties that bind the husband and wife to each other. This fact the defendants doubtless fully realized, and well knew how much more difficult it would be to accomplish a separation if a child or children related to them by consanguinity was to be turned out into the world with a mother, homeless, and without a husband to aid her when sick or in distress. It was therefore a link in the chain of evidence, in connection with her other conduct towards plaintiff and her husband, and showing a motive and intention upon this question of separation.

The remaining question raised by the appellants relates to the admission of certain evidence showing that the plaintiff had a miscarriage about two months subsequent to the time that her husband separated from her, and that plaintiff's condition subsequent to such separation caused by the wrongful conduct of the defendants predisposed her to a miscarriage. The uncontradicted evidence, admitted without objection, showed that, immediately after her husband separated from her, she became very pale, weak, nervous, and frequently was unable to stand, and was very much excited, agitated, and sick. She also testified, without objection, that, from the time of such separation to the time of the miscarriage, she was in a miserable condition, nervous all the time; that she did not sleep one hour during each night; that she was very sick; that she suffered both mentally and physically all the time, on account of her condition and the trouble which she was having. While in this condition she had a miscarriage, and the evidence of a physician tended to show that such existing condition on her part through such period of two months might predispose her to a miscarriage. This was competent evidence, as tending to show the effect of defendants' conduct upon her health, and was proper for the consideration of the jury, in case they found that the miscarriage was the direct result of such conduct, upon the question of damages, in connection with the willful misconduct of the defendants in alienating the husband's affections from his wife and causing him to separate from her.

While the damages are seemingly large, yet, as the conduct of the defendants appears to have been willful and malicious, we cannot hold that they are excessive, or that the verdict was the result of passion, partiality, prejudice, or improper influences on the part of the jury.

The order denying the motion for a new trial is therefore affirmed.

CANTY, J. I cannot concur in that part of the foregoing opinion which discusses the question whether a wife is entitled to maintain an action for alienating her husband's affections. The opinion fails to notice the case of Kroessin v. Keller, 60 Minn. 373, 62 N. W. 438, and the language used is broad and sweeping enough to overrule that case. In my opinion, the wife cannot, either at common law or under our statute, maintain an action for adultery with her husband. Our statutes should not be construed as attempting to unsex the husband, or to give a cause of action for the seduction of him who is nearly always himself the seducer or aggressor. But in my opinion an action may, under those statutes, be maintained by the wife for enticing away the husband and inducing him to abandon her. I concur in the other portions of the opinion.

MITCHELL, J. I concur in the result arrived at in the opinion of the court, except that I think the damages awarded were clearly excessive. The extracts from the evidence quoted in the opinion tend to clothe the case with a good deal of sentiment, and to present the conduct of the defendants in a most unfavorable light. But there is an atmosphere about the case which can only be fully felt and appreciated by reading the entire record. While it perhaps fairly appears that the defendants were never fully satisfied with their son's marriage to the plaintiff, yet I can discover no evidence that they ever contrived or contemplated bringing about a separation between them until after the difficulty arose between the parties themselves shortly before the separation took place. The most that I think the evidence tends to prove is that, after this quarrel or misunderstanding took place, the defendants, instead of attempting to bring about a reconciliation, availed themselves of the opportunity to bring about a separation with a view to the subsequent dissolution of a marriage with which they had never been entirely satisfied. It is both impracticable and useless to discuss the evidence, but the conclusion at which I have

arrived from an examination of the whole of it is that the case was not one justifying any considerable amount of merely punitive damages, and that the amount of the verdict is very far in excess of plaintiff's actual damages. On the point referred to by Justice CANTY, I may add that I fully agree with him in the distinction which he makes between this and the Kroessin case, and that I do not think any member of the court intended to overrule or modify the doctrine of that case.