ELIZABETH H. SERVIS, Respondent, *v.* GEORGE SERVIS, Appellant, Impleaded with Another.

HUSBAND AND WIFE — ACTION BY WIFE FOR ALIENATION OF HUS-
BAND'S AFFECTIONS — ERRONEOUS REFUSAL TO CHARGE. Where, upon the
trial of an action brought by a wife against her husband's parents to
recover damages for alienating his affections from her, the evidence is con-
flicting and would have warranted the jury in finding that, if he ever had
any affection for her it had been alienated in some other way than by that
pursued by the defendants, the refusal of the court to charge that if, at
the time of the abandonment, the plaintiff's husband had no affection for
her, or that it had been previously alienated by other causes she could
not recover, is reversible error.

*Servis* v. *Servis*, 64 App. Div. 612, reversed.

(Argued October 22, 1902; decided November 18, 1902.)

APPEAL from a judgment of the Appellate Division of the
Supreme Court in the fourth judicial department, entered
July 31, 1901, affirming a judgment in favor of plaintiff
entered upon a verdict.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*Theodore H. Lord* and *Edward P. Coyne* for appellant.
The plaintiff failed to sustain the burden of proof resting
upon her to show that the defendant was the active procuring
cause of her abandonment. (*Serles* v. *M. R. Co.*, 101 N. Y.
651; *Taylor* v. *City of Yonkers*, 105 N. Y. 202; *Bond* v.
*Smith*, 113 N. Y. 378; *Laidlaw* v. *Sage*, 158 N. Y. 73;
*Ruppert* v. *B. R. R. Co.*, 154 N. Y. 94; *Bennett* v. *Ben-
nett*, 116 N. Y. 584; *Hutcheson* v. *Peck*, 5 Johns. 196;
*Barnes* v. *Allen*, 1 Abb. Ct. App. Dec. 111; *Hermance* v.
*James*, 32 How. Pr. 142; *Buchanan* v. *Foster*, 23 App. Div.
542.) The defendant in the exercise of his parental authority
was authorized to advise and counsel his son, and in the
absence of proof of coercion or malicious interference the
plaintiff failed to establish her cause of action. (*Hutcheson*
v. *Peck*, 5 Johns. 196; *Campbell* v. *Carter*, 6 Abb. Pr. [N.

S.] 151; *Hermance* v. *James*, 32 How. Pr. 142; *Pollock* v. *Pollock*, 9 Misc. Rep. 82; *Eldridge* v. *Eldridge*, 79 Hun, 511; *Buchanan* v. *Foster*, 23 App. Div. 542.) The trial court erred in denying defendant's motion to dismiss the complaint on the ground that it did not state a cause of action. (*Hutcheson* v. *Peck*, 5 Johns. 196; *Campbell* v. *Carter*, 6 Abb. Pr. [N. S.] 151; *Hermance* v. *James*, 32 How. Pr. 142; *Pollock* v. *Pollock*, 9 Misc. Rep. 82; *Eldridge* v. *Eldridge*, 79 Hun, 511; *Smith* v. *Lyke*, 13 Hun, 204; *Schuneman* v. *Palmer*, 4 Barb. 227; *Bennett* v. *Smith*, 21 Barb. 439.)

*Edward J. Rosenau* and *John F. McGee* for respondent. The plaintiff sustained the burden of proof resting on her and showed that the defendant was the active procuring cause of her abandonment. (*Moss* v. *Sherrill*, 63 Barb. 21; *Chaffee* v. *Morss*, 67 Barb. 252; *Brooks* v. *Moore*, 67 Barb. 323; *Cheney* v. *N. Y. C. & H. R. R. R. Co.*, 16 Hun, 415; *Reich* v. *Peck*, 83 Hun, 214.) The claim of the defendant that the court erred in not charging as requested is not well taken. (*Raymond* v. *Richmond*, 88 N. Y. 671.) The complaint did state a cause of action. (*St. John* v. *Northrope*, 23 Barb. 30; *Cady* v. *Allen*, 22 Barb. 388; *Wall* v. *B. W. Works*, 18 N. Y. 119; *Lounsbury* v. *Purdy*, 18 N. Y. 520; *Whittlesey* v. *Delaney*, 73 N. Y. 571; *Moffat* v. *Fulton*, 132 N. Y. 507.)

PARKER, Ch. J.    A substantial judgment has been rendered in this case upon a verdict determining that defendants alienated from the plaintiff the affections of her husband, their son, Samuel H. Servis. The Appellate Division reversed as to the defendant Matilda Servis, granting a new trial on the ground that the verdict was contrary to the evidence, but affirmed by a divided court as to the other defendant.

Some time in the year 1895 plaintiff and Samuel were introduced at the house of a neighbor. He accompanied her home and obtained her consent to see her frequently. Afterward they met occasionally but under circumstances calculated

not to attract the attention of the neighbors, until June 18, 1897, when they were privately married in Buffalo. A considerable portion of the day had been devoted to horse races and drinking by the young man, who was taking a short vacation from school. They spent all of that night together. On all other occasions before and after the marriage when they met it was only for a brief period and at such places and under such circumstances as would be likely to prevent their meetings becoming known to relatives or acquaintances. This continued until nearly two years after the marriage when plaintiff began to insist that her husband should acknowledge their relations, and support her. Her threats and entreaties seem to have been alike unavailing, and so on March 23, 1899, she wrote to his father, as she had threatened, informing him of the marriage. The father testified he never received her letter. Samuel testified his father was ill at the time and that he (Samuel) went to the post office, got the registered letter, recognized plaintiff's handwriting in the address, opened the letter, read it, concluded that it was not prudent that his father should see it, and that his father did not see it or learn of its contents.

About the last of April Samuel went away and he wrote plaintiff informing her of the fact. He resided in Colorado until this action was tried, when he appeared as a witness for defendants, testifying emphatically that they had not in anywise contributed toward his decision to go away nor persuaded him to go. Appellant testified they had not attempted to alienate the affections of their son from his wife, saying he never had any conversation with his son in reference to his marriage.

The evidence relied upon to satisfy the court and jury — notwithstanding this positive evidence of both appellant and his son — that neither defendant had in anywise participated in any effort looking to an abandonment of plaintiff by the son, consists of alleged declarations made by defendants after April 26, 1899, when Samuel left the state with no apparent intention of returning.

Plaintiff testified that on May 1, 1899, she called on defendants and that her conversation with appellant was in part as follows: "Mr. Servis  *  *  *  said, ' I never approved of it, and you know it would be better for me that his son should leave me now than to leave me later.'  *  *  *  He said he did not want his son to live with me.   He said he would give him anything to keep him from me.   He said his son had gone west the Saturday night before, but he didn't say where. I said, ' Sam had no money to go away with.'   He said, ' He sold the horses.  *  *  *  I gave them to him so that he would have money to go away with.'   He said he gave him money.   He could not allow him to go away without any. He said he didn't want me for a daughter-in-law.   He said he didn't want me, and Sam should never live with me if he could do anything to keep him from me.   He said he would give his son anything and everything he wanted.   He would never have to work if he didn't live with me.   He told me that in his own house, and said that he had said the same thing to my husband."

Now it is true appellant denies ever having had any such conversation with plaintiff, and asserts that he never threatened his son or urged him in any way to refuse to live with plaintiff.   In that the son corroborates him.   But the jury were at liberty to believe the testimony of plaintiff instead of that of appellant and his son, and the verdict shows they did so. From her testimony it must be said that there was some evidence tending to show that appellant used some influence against plaintiff after he knew of the marriage, and perhaps there may be found in the record some evidence tending to support an inference of fact that appellant contributed toward alienating from plaintiff her husband's affections.

Therefore, we should affirm the judgment did we not think that, under all the facts presented by this record, the court should have charged the jury, as the defendants' counsel requested, " that if the jury find from the evidence that, at the time of the abandonment, the plaintiff's husband had no affection for her, or that it had been previously alienated by

other causes, that then and in that case the plaintiff is not entitled to recover." That the request presented, under the circumstances in this case, a proposition which the defendants were entitled to have charged cannot be questioned.

There is in this record very little evidence of affection upon the part of either party. . If it ever existed, both parties have been cautious in giving expression to it. This — considered with the fact of the secrecy always 'insisted upon by the husband and observed by the wife down to the time almost of the going away of Samuel, and the testimony of himself and his father, together with that of .the attorney with whom Samuel consulted — strongly tended to show that plaintiff's husband did not hold her in affectionate regard, and would have warranted the jury in finding that if he ever had any affection for her it had been alienated in some other way than by threats made or inducements offered or deceit practiced by appellant. .

The court in refusing to charge as requested gave no other reason than that conveyed in the following phrase : " I will not modify my charge on that subject." If the main charge sufficiently covered the subject .the court was entirely justified in refusing any modification, but after a careful reading of it we are not able to reach the conclusion that the idea conveyed in that request was presented at all to the minds of the jury. The court did properly charge the jury that the burden was upon plaintiff to establish that her husband was alienated from, and induced to leave her by the active interference of the defendants, but the jury may very well have come to the conclusion, from the alleged declarations of appellant that he had given him money to go away with and horses to sell for that purpose, that the burden resting upon the plaintiff was met, whereas it may well have been, as testified to by appellant, that Samuel having made up his mind to go, his father simply furnished him the means.

Of the absolute right of a father to furnish money for the support of a son who has, for reasons good or bad, determined to abandon his wife, there is of course no doubt — a right that

he may exercise without being subjected to respond in damages to the deserted wife provided its exercise be not part of a general scheme having for its object the alienation of the husband's affection for his wife and her abandonment by him. Hence it was important in a case such as this that the jury should have their minds drawn sharply to the claim of appellant that if there ever was any affection existing between these parties it was alienated by other causes before he even knew of the marriage, and if found by them to be well grounded that there could be no recovery. We think the exception was well taken and calls for a reversal of the judgment.

The judgment should be reversed and new trial granted, with costs to abide event.

BARTLETT, J. (dissenting). The jury and the Appellate Division have decided in favor of the plaintiff and I vote to affirm the judgment awarding her damages.

The story of the plaintiff's married life is a pitiful one, and if this judgment is to be reversed on the ground that she did not sustain the burden of proof, it will introduce into the law of this state the startling doctrine that a father, who is of opinion that his son, twenty years of age, has married beneath him socially, may deliberately set at defiance the obligations of the marriage contract, intervene between man and wife and prevent the founding of a home where the contracting parties had planned to live together in that unity which public policy dictates.

The jury were permitted to find, on conflicting evidence, that the father of the husband was the active, procuring cause of the abandonment of this wife. From the moment the father heard of this marriage, until the separation was finally accomplished, he threatened that he would prevent its full consummation, if possible.

A wife has the right to the conjugal society of her husband, *consortium,* and if it be willfully violated by a third person, she may maintain an action in her own name. (Bul-

lock on Husband and Wife, 235; *Jaynes* v. *Jaynes*, 39 Hun, 40; *Baker* v. *Baker*, 16 Abb. N. C. 293, in which the opinion of MARTIN, J., is instructive.) This is, strictly speaking, a property right, the invasion of which she may resist. (*Bennett* v. *Bennett*, 116 N. Y. 584; cited with approval in *Kujek* v. *Goldman*, 150 N. Y. 176, 180.)

This plaintiff does not base her claim for recovery upon the fact that the husband's father expressed his disapproval of the marriage and permitted this son to live at home. The trial judge pointed out in his charge that it was only when a parent interfered between man and wife with an evil motive and to gratify his own taste that he was liable.

It is undoubtedly the law that the separation and abandonment brought about by the intervention of the parent must be wrongful.

The complaint in this action does not charge malice in express terms, but alleges a state of facts equivalent to it. Furthermore, whatever the defects in pleading, the evidence upon which the plaintiff rests her judgment came into the case without objection, so that defendant is deemed to have acquiesced in the issues as tried.

The plaintiff and defendant's son, Samuel, were married June 18th, 1897. The plaintiff testified that her husband wished the marriage kept secret for a time, as he stated the publication of it would make trouble for him at home. The wife acquiesced in this situation for nearly two years, she still filling the position of maid for the wife of Dr. Cary, and Samuel continued to live at home. The plaintiff told her mistress of the marriage and exhibited her marriage certificate. In March, 1899, the plaintiff, having in the interval vainly insisted on many occasions that the marriage should be made public, sent a registered letter to defendant, telling him of the marriage; this letter Samuel intercepted.

It appears from the testimony of Dr. Cary, in whose family the plaintiff resided, that shortly after the marriage, in October or November, 1897, he informed defendant of the fact, who said he did not believe it. The doctor told defend

ant that he knew plaintiff had her marriage certificate and that they were married in Buffalo "back in June." Defendant said, "I won't have it and I will do everything I can to stop it." Samuel, the husband, testified that just before May, 1899, he saw that "it had gone to the limit of keeping things secret and putting it off." Samuel further testified as follows : "There was a time when I agreed to live with her and there was a date partly set at which we would commence keeping house. The date was May, 1899. She wanted me to live with her the first of May and I wanted to wait until the 15th and she would not wait." Samuel also testified that he left home for the west just before May 1st.

The plaintiff swears that she went down to Geneseo, where defendant lived, on May 1st, 1899, with the avowed purpose of seeing Samuel and making him redeem his promise to live with her. She swears she went to defendant's house and saw him. "I told him I was Sam's wife and wanted to see him. Then he came up and said, 'Sam had gone, went the Saturday night before.' That was all that was said that night." The next morning she met the defendant again and the conversation was resumed as to the marriage, as follows : "He (defendant) said *he would give him anything to keep him from me* and he gave him the horses to go away himself. He said he did not want his son to live with me. He said he would give him anything to keep him away from me. He said his son had gone west Saturday night before, but he did not say where. I said, 'Sam had no money to go with.' He said, 'he sold the horses.' I said, 'They were not his to sell.' He said, 'yes, I gave them to him so that he would have money to go away with.' He said he gave him money. He couldn't allow him to go away without any. He said he didn't want me for a daughter-in-law. He didn't want me and Sam should never live with me if *he could do anything to keep him from me.* He would give his son anything and everything he wanted. He would never have to work if he didn't live with me. He told me that in his own house *and said that he had said the same thing to my husband.*"

This was evidence the jury had the right to believe, and in view of the fact that Samuel was thus sent off west with the active assistance of the defendant the Saturday before he was to begin living with his wife and eighteen months later was brought back to trial, it was sufficient to satisfy the jury that the defendant, in the light of his own admissions, originated the scheme, carried it out in disregard of the marriage contract, because he did not desire his son to live with a wife of whom he disapproved, not because there was anything against her moral character, for the record establishes the contrary, but for the reason she was beneath him in social position.

The record clearly shows that if any one was likely to suffer by this marriage, it was the wife rather than the husband.

It is true that this wife, separated from her husband against her will, conspired against by his father and with no one to assist her, was compelled to make out the best case she could, and while it was of necessity drawn from the " camp of the enemy," it was sufficient to satisfy a jury who were confronted by the witnesses, and the Appellate Division whose peculiar jurisdiction it is to look into the facts.

The appellant raises a question of law on the refusal of the trial judge to charge " that if the jury find from the evidence that at the time of the abandonment the plaintiff's husband had no affection for her, or that it had been previously alienated by other causes, that then and in that case the plaintiff is not entitled to recover."

This request to charge contains two distinct propositions of law : (1) If plaintiff's husband had no affection for her at the time of the abandonment there could be no recovery ; (2) if at the time of the abandonment the husband's affection had been alienated by other causes there could be no recovery.

If either proposition involves legal error, or was covered by the main charge, then the request was properly denied, as it should have been divided in order to secure a proper ruling. As to the first proposition, it is manifestly erroneous. A defendant who deprives a wife of the right to the conjugal

society of her husband, of *consortium*, of a home and all that it implies, may not measure the degree of affection that existed when the wrong was inflicted. The right to shelter, support and protection of a husband's name and presence is property. As to the second proposition, it is answered by the familiar rule that the trial judge is not required to charge an abstract proposition that is covered by the main charge. In this case the charge was full, fair and covered the precise point under consideration. The trial judge, speaking of plaintiff's burden of proof, said : " She is bound to satisfy you by a preponderance of all the evidence in the. case that these defendants are responsible, that her husband was alienated and that he was induced to leave her and abandon her by their active interference, and that she in that respect has sustained a loss, and it is for that loss she asks a verdict at your hands. If she has satisfied you in that way, that they are liable and she has sustained any loss, then she is entitled to be compensated for the loss in money." This charge covers both alienation of affection and abandonment, and the request to charge the two abstract propositions was properly denied as covered by the main charge, and as multifarious.

The judgment should be affirmed.

GRAY, O'BRIEN, HAIGHT and VANN, JJ., concur with PARKER, Ch. J.; MARTIN, J., concurs with BARTLETT, J.

Judgment reversed, etc.