COCHRAN v. COCHRAN et al.

(Supreme Court, Appellate Division, Second Department. June 29, 1908.)

1. HUSBAND AND WIFE—ALIENATION OF HUSBAND'S AFFECTIONS—WIFE'S RIGHTS.

That a cermonial marriage was not physically consummated does not affect the wife's right to sue for an alienation of his affections.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence *held* to show that defendants contributed to the alienation from plaintiff of her husband's affections; he being defendants' son.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 26, Husband and Wife, § 1124.]

3. SAME.

Though, before their 18 year old son married, defendants could legally take any steps they deemed proper to prevent his marriage, he and his wife having a legal right to marry, after that event she had the right to his love, companionship, and consortium and all the incidents of marriage, and defendants became liable for any acts tending to disturb her rights after they learned of the marriage, though the husband and wife had agreed that the marriage should be kept a secret until they should become 21 years old.

4. SAME.

In an action for alienating defendants' son's affections from his wife, she could show conversations between her and her husband before and after the marriage and in defendant's absence in which he detailed conversations with his father respecting the affair.

5. SAME—DAMAGES—RECOVERY NOT EXCESSIVE.

Seven thousand, five hundred dollars was not a grossly excessive recovery against plaintiff's husband's parents for alienating his affections.

[Ed. Note.—For cases, in point, see Cent. Dig. vol. 26, Husband and Wife, § 1125.]

Rich, J., dissenting.

Appeal from Trial Term.

Action by Sallie Cochran, by Augusta J. Bailey, her guardian ad litem, against Richard Cochran and another. From a judgment for plaintiff, defendants appeal. Affirmed.

Argued before WOODWARD, JENKS, GAYNOR, RICH, and MILLER, JJ.

William C. Beecher, for appellants.
I. R. Oeland, for respondent.

WOODWARD, J. The plaintiff in this action, a virtuous, industrious, and Christian young woman, was married to a son of the defendants when she was 18 years of age; her husband at the time being of practically the same age. This fact was known to both of them. They met at a church function. The young man appears to have been very devoted. and they appear to have become engaged within a few

months of their original meeting in 1902. Ernest Cochran, defendants' son, was known by them to be keeping company with this young woman. The young people attended the same church with the Cochran family, and the attentions of Ernest were open and public. On the 21st day of September, 1903, the young people, knowing at the time that Ernest's father and mother did not approve of their intimacy, entered into an arrangement that they would be married, and that the marriage should be kept a secret until they should arrive at the age of 21 years; Ernest explaining that this was necessary in order to avoid complications with his father, who would send him away. It was agreed between them that they should not live together until the time fixed for the announcement, and it appears from the evidence that the marriage was never physically consummated, though this, as we view the matter, has nothing to do with the plaintiff's cause of action for the alienation of her husband's affections. The fact that she might be willing to waive some of her rights as a wife does not operate to deprive her of the rights which she did not waive as to the defendants in this action. After the marriage the plaintiff continued to live at home, and her husband appears to have escorted her to her work in the morning, and to have visited her every evening, until finally the parents took strong measures to prevent him from visiting her, when he announced the fact of the marriage. Immediately after the fact became known to the defendants, they took steps to bring about a separation. They went to the home of the plaintiff, where their son was at the time, and inquired for him at midnight, and, on being told, at his request, that he was not present, they went away, only to send for him again in the morning. The evidence shows that the father took the boy on his lap, and told him that "these people don't love you as we do," and appealed to the boy to stay with his mother through her troubles in reference to the death of her sister, and did many things calculated to work upon the feelings of a youth of 18, and that subsequently the boy was furnished money and was sent away from home, and that a letter which the boy subsequently wrote to the plaintiff through one of the defendants was summarized in such a manner as to indicate that it contained no words of endearment; merely the cold facts being transmitted to her. Plaintiff's husband was by these acts on the part of the defendants taken from her and kept away from her for a long time, during which the defendants refused to permit the plaintiff to know of his whereabouts, and when the young man finally returned to the home of his parents, making no effort to communicate with the plaintiff, she had him arrested for failure to support her. Then it was that Ernest agreed to live with her and support her, and the story of the night which these two young people spent together in the apartments provided by the defendants shows the spirit of the whole matter, and amply justifies the verdict of the jury in favor of the plaintiff. Ernest took this young woman to a barren room, and, after remaining there with her for a time, he announced that he was going into a back room to sleep with a cousin. To this the wife refused to consent, and these two young people lay upon the bed in this room

with their clothes on, and talked all night. Ernest made no provision for food, or any means of cooking it, and the plaintiff the next morning returned to her mother's home, and the husband never returned after her, or made any further move in the direction of living with and supporting his wife, and it is apparent from his testimony upon the trial that he has entirely ceased to have any affection for the plaintiff. The evidence in this case, as compared with that which is to be found in Servis v. Servis, 172 N. Y. 438, 65 N. E. 270, is overwhelming that the appellants used some influence against the plaintiff after they knew of the marriage, and that they contributed toward alienating from the plaintiff her husband's affections, and in the case cited the court distinctly say that the judgment should have been affirmed except for an error in the charge of the court.

We have no quarrel with the language of the court in Pollock v., Pollock, 9 Misc. Rep. 82, 29 N. Y. Supp. 37, that it "yet remains to be judicially sanctioned that parental solicitude for a child's felicity is a reprehensible quality," etc., but here the facts complained of occurred after the marriage, and at a time when the rights of the plaintiff had become vested. The defendants in this case had a perfect right in law to take any steps which seemed to them right and proper to prevent Ernest going with the plaintiff. They had a perfect right up to the 21st day of September, 1903, not only to forbid, but to use all necessary force to prevent, the marriage of their son to this plaintiff, but upon that day a new element entered into the calculation. Both of the parties had a legal right to marry, and the marriage carried with it the right of this plaintiff to the love, companionship, consortium, and all of the incidents of marriage. Whatever may have been the agreement as between the plaintiff and Ernest, as to these defendants, the law gave her these rights. All conversations, not tainted with fraud, were merged in the marriage contract, and, while the plaintiff and her husband might agree that there should be no consummation of the marriage until a particular date, or that they would not hold themselves out to the public in their new relations, the defendants could gain no rights under such an agreement, except that they could not be held liable for infractions of the wife's rights so long as the truth was withheld from them. When, however, they became aware of the marriage, they owed the duty to this wife to respect her rights, and acts tending to disturb her rights subjected them to liability for damages, and these the jury have assessed. If these parents had been as solicitous of the welfare of their son before the marriage as they would have us believe they became when the marriage was known, the difficulties might have been obviated. They appear to have been passive for months, knowing that this willful boy, who disregarded the wishes of his mother, was going to see this young woman every evening, and they made no determined effort to break off the intimacy until after the marriage. Then, when their acts forced an admission of the truth, instead of making the best of it, and giving to the plaintiff the moral support of parentage, they persist in their effort to assert parental authority over the son, and thus to expose this young woman, not alone to the loss of her marital rights, but to the loss of the respect and con-

fidence of her friends and associates; and to expose her to the temptations always incident to these unfortunate complications.

It is not necessary to determine, in an action for damages for the alienation of affections, whether the marriage of an infant operates to take away the control of the father and emancipates the son, though it would seem to follow that, with the obligations which the marriage relation involves, the son, once having entered the relation, is bound to perform its duties. If this is true, then the lesser relation must cease. But that is not the question here. The matter now before us is the alienation of the husband's affections, and the evidence in this case clearly justified the jury in holding that the rights of the wife had been invaded by the practical abduction of the husband, and keeping him away from her until he was willing to take the stand as a witness in behalf of the defendants, showing that the affection had ceased. There was no question here, as in Servis v. Servis, supra, of the affections having been previously alienated, or never having existed.

It is urged, however, that there was error in admitting conversations of the plaintiff with her husband, not in the presence of these defendants, both before and after the marriage, in which the husband detailed conversations with his father in reference to the affair. We have examined these matters, and we are persuaded that they were a part of the res gestæ; that they were matters which it was proper to bring out as showing the situation of the parties—the stand-point from which they acted—and there is no reason to suppose that the evidence was understood in any other relation. The objections were very general, and, when the case is read, we are of the opinion that the evidence was competent for the purpose for which it was introduced, and that there is not reversible error presented by the exceptions.

The suggestion that this verdict of $7,500 is grossly excessive does not appeal to us. This young woman has been wronged. All of the rights and privileges which belong to the marriage relation have been denied to her under circumstances which are not calculated to arouse great sympathy for the defendants, and we are of opinion the judgment should stand.

Judgment and order affirmed, with costs.

GAYNOR and MILLER. JJ., concur. JENKS, J., concurs in result.

RICH, J. (dissenting). I find myself unable to concur in this case. Defendants tried in various ways to induce their son to spend more of his evenings at home. There is no claim that they had any objection to plaintiff. What they objected to was that he spent so much of his time in the society of females. It was neither strange nor unusual that affectionate parents should be solicitous regarding the welfare of their 18 year old boy. The plaintiff understood their feelings, but did not respect them, and agreed with defendants' son that a clandestine marriage ceremony should be performed and kept a secret until they were of the age of 21 years; that she would not take her husband's name; that they should continue to live apart; and that the marriage

should not be consummated until they were 21 years old. Defendants learned of the marriage within a few days after the ceremony was performed, and I am not surprised that they were grieved and disappointed at the conduct of their son. There is no claim of any impropriety on the part of defendants up to this time. The agreement to live separate from her husband was terminable at the pleasure of plaintiff, and she availed herself of the privilege of terminating it at the very first opportunity. They were married on Sunday, and on the following Saturday evening plaintiff's husband told her that his father wished him to stick by him through the trouble with his mother, who had just lost her sister. The father said that, if he would give half of his time to his mother and half to the plaintiff, everything would be all right. Plaintiff testified:

"I told him that, if they had not known it, it would have been different, but their knowing it I wanted him to acknowledge before everybody. I wasn't going to be half way with him. I had had half of his time, and I wasn't going to take it now; and we felt very badly about it."

He remained at plaintiff's home that night, occupying a room alone. About midnight, and while he was there, defendants called to inquire for their son, and were told by plaintiff's mother that their son had left for home. Next morning plaintiff went with her husband to Ft. Green. Speaking of the conversation had while there, she testified:

"We sat down on a bench in the park, and I told him that I was afraid in my heart about it, and I asked him if he was not sorry. I said, 'We have been foolish, Ernest'; and he said, 'No; not if I had to go all through it again, well, I would do it all over again. You are like a vine twining in and out of my life. I know what I was doing. I am no boy. You always told me I was; but I am not. I know my own mind.' And I said: 'Ernest, do you remember the time you said you cursed your father, and you hoped you would see the day he wanted for a dollar?' He said: 'That is all over, you know. They are good to me.' And he could undo it, but he wouldn't; but what is a little time to us. He did not say how they could undo it. He said his father was good, and that two years would soon fly, and that then we could be together forever, and, if I would only look at it as he did, it was for the best, and they were so good. 'They mean good, Sallie,' he said. 'They do mean good, and if you will only try and just think the way I do, and let me give half my time to my mother and half to you. I want to do right by all.' And then I saw he was so good. I said, 'Yes; Ernest, I will give in;' and then I said, 'No,' I was mad about it. I said, 'No; I won't. I hate them;' and he said, 'You have good reason to Sallie, and I don't blame you.' That was in the park, this conversation. I should imagine then it was about half past 10 in the morning. Then we came home. After we got home, we had been in the house about 10 minutes—no, it was 10 to 12—and his brother rang the bell, and mamma went to the door, and he asked if Ernest was there, and mamma said, 'Yes,' and she called him, and Ernest went down to the door, and Frank burst out crying. He said: 'Pop has had hysterics.' He talked with Frank. I stood right by him. He said to me, 'My father is sick, Sallie, and he wants me,' and he said, 'Shall I go?' and I waited quite a few minutes, and I said, 'Well, Ernest, if he is sick, yes.' That was about 10 minutes of 12. He came upstairs to get his hat, and he kissed me good-bye; and I said 'Ernest, don't be any longer than you can help, will you. You will come right back, won't you?' And he said, 'Yes, I will promise you Sallie. I will come right back;' and then, when he left, he looked back at the window, and waved his hand. The next time I saw him was the time I had him arrested."

The young husband left that house with conflicting emotions. There were his filial duties on the one side and the marital obligations on the

other. His wife had broken a sacred promise. He must leave his mother. She "hated" them, and "wasn't going to be half way with him." She had a right to assume this attitude, but in considering whether defendants were responsible for the separation may we not take into consideration that a saucy, selfish, and irascible disposition was revealed their boy? It is true that after this interview "the father took the boy on his lap, and told him that 'these peop'e don't love you as we do.'" It was said, however, upon his return home after his first interview with plaintiff described by her as follows:

"Ernest went in the morning, and his father came about 4 o'clock. Ernest left about 12, and the father came about 4. The father came in, and he said: 'Well, I have come over to see how we can fix matters up. Ernest is sick, and I have taken him to the doctor's, and the doctor said his nerves are all unstrung. He is only a poor, 18-year old boy. He ought to be playing with boys. There are lines in his face, and I think it best that he should stay home and study and fit himself for a position where he could take care of you. His mother wants his time now. For five years he has made his mother's heart ache, and he has not obeyed her, not only since he has known you, and, if you are his choice when he is 21, he shall come with my blessing. Anyway the marriage is not legal.' And I turned, and I said: 'Mr. Cochran, I will never stand it, I won't stand it, and I will fight you, you know.' Then he said we will have to find some other way, and he began to pray for me, and I called him a hypocrite, and I told him I didn't need his prayers, and that I would make Ernest so jealous that he wouldn't be able to stay in the house, that I knew him, and he said: 'That is right. Go ahead and make him suffer. He deserves it.' And I said, 'I won't do it to please you.' He said: 'I had a brother separate from his wife two years ago; and he said the marriage isn't legal even. The Bible says so.' And I said, 'The Bible don't say to put asunder man and wife;' and he got up and went to the door and took his hat and turned to me, and said, 'You will at least say I have done my duty.' I told him, 'No,' I didn't think so, and I wanted him to get out of my house just as soon as he could go. That ended the interview with Mr. Cochran."

I have no doubt but that the father spoke the truth, and that the son was anxious to get away. Several letters were written by the father after the departure of his son that were unwise and ill advised. The one addressed to the General Secretary of the Young Men's Christian Association was inexcusable; but the judgment cannot be predicated upon these letters, or what the father did after the arrest of his son. It was his duty to aid his son at that time. He had a right to advise his son without incurring liability. Parents may exercise their discretion in advising married children, and it is their duty to do so when the interests of the child require it, so long as its exercise is not a part of a general scheme having for its object the alienation of the husband's affections for his wife. I am unable to find any satisfactory evidence that these defendants advised their son to go away, but suppose they did. They had a right to do even that and to defray his expenses (Servis v. Servis, 172 N. Y. 438, 65 N. E. 270), providing it was not in furtherance of a scheme to alienate his affection from the plaintiff. The marriage did not supersede the filial relation so long as he continued to reside in his father's house. Mr. Justice Bischoff has wisely said in Pollock v. Pollock, 9 Misc. Rep. 84, 29 N. Y. Supp. 38:

"It yet remains to be judicially sanctioned that parental solicitude for a child's felicity is a reprehensible quality, and that the natural grief and displeasure of the parent because of the child's marital alliance, which to the

former seems apprehensive of the latter's future discontent, must give way
to rejoicing, lest the parent should be exposed to liability in damages for hav-
ing by his disapproval deprived his child's spouse from the enjoyment of his
or her anticipated advantages of the marriage."

The verdict was against the weight of the evidence. It was incum-
bent upon plaintiff to show by a preponderance of the evidence that
defendants acted from malicious or unworthy motives, and in this she
failed to establish a cause of action. The verdict was also excessive.
Plaintiff's husband had not contributed to her support. They had nev-
er cohabited together. She had not taken his name. She contin-
ued to go in society the same as before, and was known by her friends
and associates as a maiden. She had promised to live separate and
apart from her husband until she became 21 years of age, and this fact
cannot be overlooked where loss of cohabitation, support, and the
society of the husband are the gist of the action.

I vote for a reversal.