[Civ. No. 2920. Second Appellate District, Division Two.—October 10, 1919.]

## MARIE M. BOURNE, Respondent, v. HOPE BOURNE et al., Appellants.

[1] ALIENATION OF AFFECTIONS—ACTION FOR DAMAGES—STATE OF HUSBAND'S FEELINGS—EVIDENCE—HEARSAY DECLARATIONS.—In an action for damages by a wife against her husband's parents for the alienation of the husband's affections, testimony of the plaintiff, supplemented by that of her witnesses, as to declarations which they claimed the husband made in their presence, of criticism and unkind remarks, and attempts to influence him against his wife, made by his parents, chiefly his mother, is admissible for the purpose of showing the state of the husband's feelings during the period in question; and its admission over the objections of defendants' counsel that it is incompetent and hearsay is not error, where the jury are expressly instructed that they are to receive it for no other purpose, and that it is not competent evidence to prove any of the conduct or statements therein attributed to the defendants.

[2] ID.—EVIDENCE COMPETENT FOR SINGLE PURPOSE—ADMISSIBILITY OF.—Where evidence is competent and material for any purpose under the issues on trial, it is admissible for that purpose, although it may be inadmissible and prejudicial when applied to other issues to which it is pertinent.

[3] ID.—DETERMINATION OF HUSBAND TO ABANDON WIFE—ASSISTANCE BY PARENTS—LIABILITY—PRESUMPTION OF BAD MOTIVE.—Where the determination of the husband to abandon his wife was the result of his own volition and not influenced by any willful or malicious act of his parents, the latter cannot be held responsible because they assisted him in carrying out his purpose; and no presumption of a bad motive arises from the mere fact that they gave him such assistance.

[4] ID.—MARRIAGE OF CHILD—RIGHT OF PARENTS TO FURTHER CONSIDER WELFARE OF.—The marriage of a child does not terminate the right

---

3. Liability of parent or guardian for causing separation of husband and wife, notes, 8 Ann. Cas. 813; Ann. Cas. 1917E, 1017; 9 L. R. A. (N. S.) 322.

Malice as essential to action for alienation of affections by parent, note, 46 L. R. A. (N. S.) 779.

Admissibility of evidence of defendants' financial circumstances in action for alienation of affections, note, Ann. Cas. 1914B, 803.

of the parents to interest themselves in his or her happiness and welfare; and so long as they in good faith act for what they believed is their child's welfare, no matter how mistakenly, and are not moved by malice or ill will toward the partner to the marriage, there is no liability, even where they use their influence to bring about a separation.

[5] ID.—RELATIONSHIP OF PARENT AND CHILD—RIGHT TO SIDE WITH CHILD IN CASE OF MARITAL INFELICITY—MALICIOUS INTERFERENCE—PRESUMPTION.—The relations of a parent, particularly of a mother toward her son, are scarcely less sacred than the relationship between husband and wife; and in cases of marital infelicity, no presumption of malicious interference arises because the parents take sides with their child, unless it affirmatively appears that it is done in bad faith and from ill will toward the other party.

[6] ID.—SAYING OF HARSH AND UNKIND THINGS—INFERENCES.—The fact alone that in moments of resentment of their daughter-in-law's actions and refusal to accept their attempts at reconciliation the husband's parents said harsh and unkind things about her will not justify an inference that they violated the laws of God and society by trying to break up the marriage relation of their son and his wife.

[7] ID.—SEPARATION BY SON—FAILURE TO ASSIST DAUGHTER-IN-LAW—INFERENCES.—The fact that the parents permitted the separation of their son without offering any aid or comfort to the deserted wife constituted the violation of no legal duty, and in itself raised no inference that they instigated his desertion.

[8] ID.—CONSIDERATION OF EVIDENCE—PROVINCE OF JURY.—While the jurors are the sole judges of the weight and sufficiency of evidence, their province in receiving or rejecting evidence, as they are by the court instructed, is not arbitrary, but is to be exercised with legal discretion and in subordination to the rules of evidence.

[9] ID.—ACTION FOR DAMAGES—ESSENTIALS TO RECOVERY.—In an action for damages by a wife against her husband's parents for the alienation of the husband's affections, the plaintiff, to support a verdict against the defendants, must establish that the defendants knowingly and willfully influenced their son to withdraw his affection and companionship from her, and that this was done in a spirit of malice and ill will toward her.

[10] ID.—PRESENCE OF MOTIVE FOR ALIENATING SON'S AFFECTIONS—LOSS OF LOVE FOR WIFE—EVIDENCE OF CAUSE.—The fact that the parents may have had a grudge against their daughter-in-law, or a motive for alienating their son's affections, would not suffice to prove that his love for his wife waned and flickered out as the result of his parents' conscious and willful influence or persuasion, and not as the result of some innate cause born within his breast

unassisted by any acts on the part of his parents, done for the purpose and with the intent of bringing about that condition of heart within him.

[11] ID.—ABSENCE OF EVIDENCE OF ILL WILL OR MALIGN INFLUENCE—UNSUPPORTED VERDICT.—In this action for damages by a wife against her husband's parents for the alienation of the husband's affections, in view of the absence of any direct evidence of ill will or malign influence on the part of the defendants, the evidence was wholly insufficient to justify a verdict against strangers, much less as against the parents.

[12] ID. — PREFERENTIAL RIGHTS OF PARENTS — PRESUMPTIONS AS TO ACTS.—In actions for damages for alienation of affections the law places the parents of a married child on a much more favorable basis than that of a stranger to the family relations; and in such actions all presumptions must be that the parents acted only for the best interests of their child.

[13] ID.—WEALTH OF PARENTS—HEARSAY DECLARATIONS.—In an action for damages by a wife against her husband's parents for the alienation of the husband's affections, it is error to admit, over the objections of defendants' counsel, plaintiff's testimony of declarations by her husband as to his father's wealth.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Reversed.

The facts are stated in the opinion of the court.

Ward Chapman and L. M. Chapman for Appellants.

J. W. McKinley, Nat. B. Browne and A. W. Ashburn for Respondent.

SLOANE, J.—The plaintiff, Marie Bourne, brought this action against Harry S. Bourne and Hope Bourne, the parents of her husband, Ralph Bourne, to recover damages for the alleged alienation of her husband's affections. The case was tried before a jury, and there was a verdict and judgment for twelve thousand five hundred dollars in plaintiff's favor. The defendants appeal, basing their claim for reversal on insufficiency of the evidence to support a verdict, and error of the court in giving and refusing instructions and in the admission of evidence.

The weak point in plaintiff's case is insufficiency of the evidence that the desertion of plaintiff by her husband was caused or influenced by the fault of the defendants or that

the conduct of defendants was influenced by malice. Eliminating the hearsay evidence of all that the plaintiff and her witnesses said that the husband, Ralph Bourne, said that his parents said—and there is not a scintilla of evidence worthy of serious consideration that either the father or mother ever by word or deed tried to bring about a separation between the plaintiff and their son—there is no evidence, up to the day that Ralph Bourne deserted the plaintiff and left his home and wife—outside of this hearsay testimony—other than one isolated instance, that the father, Harry S. Bourne, ever displayed in any manner any ill will toward his daughter-in-law, or evinced any disposition that would suggest a desire to alienate from her the affections of her husband. And there are only infrequent expressions of criticism and ill-feeling toward her on the part of the mother on which to base any inference of adverse or hostile feeling on the mother's part, and these gain most of their significance when considered against the background of the hearsay testimony referred to.

This hearsay testimony, as has been indicated, consisted of the testimony of the plaintiff, supplemented by that of some of her witnesses, as to declarations which they claimed the husband, Ralph Bourne, made in their presence, of criticism and unkind remarks, and attempts to influence him against his wife, made by his parents, chiefly his mother. The following excerpts from the transcript of the evidence will serve to illustrate the character of this testimony as to alleged declarations of Ralph Bourne: "He told me that they spoke to him about coming back, and that he could not possibly get along over in Glendale because he couldn't earn his living; . . . and they said they would do anything he wanted if he would come back to Eagle Rock, and Ralph was very indignant about it, and he told me about it, and said for me not to mind what they said because they could never get him away from me. . . . Well, Ralph was very angry with his folks because he always told me never to mind what his folks said about me, because he didn't believe them; that he would never leave me for any reason in the world; . . . that he would never leave me to go back to his folks. . . . Sometimes he wouldn't tell me all that was said until later. He used to say that he didn't like to tell me everything that they said, because he said it would make me feel bad if I knew that

they were talking about me. . . . Well, at first he was very indignant about it; he didn't like to talk about it at all, because he thought it would make me feel bad, and he would always tell me that he cared more for me than anything in the world, and he would usually be very much more affectionate after he had had a talk with his folks about it; and one instance toward the last, about two weeks before he went away, he sort of sided in with his folks; he sort of drifted to their side as the time went on. . . . I told him several times that if they talked to him so much that perhaps he would leave me and go back to them. He said he never would. He said nothing in the world could ever make him leave me. . . . Ralph told me several times that they had offered him inducements; they told him that they would send him to college and pay all his bills if he would leave me—put him on his feet. . . . They always said he would never get along while he was married to me. . . . Well, at first he was very indignant with his folks, and then toward the last he sort of seemed to be drifting toward them—told me I ought to see things the way they saw them; and that was about the last that we were living together. . . . Mrs. Bourne talked to Ralph and called me every name that she could think of, and told Ralph that I was absolutely no good, and he would be better off if he had never seen me.''

[1] There was a good deal more hearsay testimony of this character. It all went in over the objections of defendants' counsel that it was incompetent and hearsay, and under a ruling of the court that it was admitted only for the purpose of showing the state of the husband's feelings during this period; and the court expressly instructed the jury that they were to receive it for no other purpose, and that it was not competent evidence to prove any of the conduct or statements therein attributed to the defendants.

It is probable that the court was correct in its ruling, although there were some of these hearsay narratives attributed to the husband, which gave purported damaging statements of his parents, that were not accompanied by any evidence of his own feelings in the matter. A fair consideration of the rulings on the extent to which such declarations may be used in evidence, in *Cripe* v. *Cripe*, 170 Cal. 91, [148 Pac. 520], *Humphrey* v. *Pope*, 1 Cal. App. 375, [82 Pac. 223]; *Barlow* v. *Barnes*, 172 Cal. 98, [155 Pac. 457], and *Jameson* v. *Tully*,

178 Cal. 380, [173 Pac. 577], are in accord with the ruling
of the trial court on this question. [2] It is undoubtedly
the law that where testimony is competent and material for
any purpose under the issues on trial, it is admissible for that
purpose, although it may be inadmissible and prejudicial
when applied to other issues to which it is pertinent. (14
R. C. L. 52; *Trenton etc. Ry Co.* v. *Cooper,* 60 N. J. L. 219,
[64 Am. St. Rep. 592, 38 L. R. A. 637, 37 Atl. 730]; *Mac-
Dougall* v. *Maguire,* 35 Cal. 274, [95 Am. Dec. 98]; *Bir-
mingham Trust & Sav. Co.* v. *Currey,* 75 Ala. 373, [Ann.
Cas. 1914D, 81, 57 South. 962]; *Diamond Rubber Co.* v. *Har-
ryman,* 41 Colo. 415, [15 L. R. A. (N. S.) 775, 92 Pac. 922];
*Baustian* v. *Young,* 152 Mo. 317, [75 Am. St. Rep. 462, 53
S. W. 921]; *Illinois etc. R. R. Co.* v. *Houchins,* 121 Ky. 526,
[123 Am. St. Rep. 205, 1 L. R. A. (N. S.) 375, 89 S. W.
530].) In this case the court did the best it could in safe-
guarding the defendants from prejudicial consequences of
this testimony by instructing the jury to disregard it for
any purpose other than that of showing the state of the hus-
band's feelings. There was abundant other evidence of Ralph
Bourne's affection for and loyalty to his wife during all the
period covered by these hearsay declarations; and, indeed,
there was no dispute on that point. In view of the seriously
prejudicial nature of these statements on the main issue in
the case, as to the conduct and motives of defendants, plain-
tiff's counsel were taking unnecessary chances of error in in-
sisting upon the introduction of these hearsay declarations.
The introduction of this testimony presents a feature of the
case which at least invites a careful scrutiny of the other evi-
dence directed to this issue, in determining whether the jury
was justified in finding the defendants guilty of separating
this young married couple. In view of the absence of any
direct evidence of ill will or malign influence on the part of
defendants, and the testimony of the husband and both the
defendants that no such occurrences took place as were re-
ferred to in the hearsay declarations, it is difficult to escape
the conviction that the jury was prejudicially influenced by
considering the hearsay statements in disregard of the in-
structions of the court. In the argument by their brief on
this appeal, respondent's counsel, speaking of these declara-
tions, suggest their force as a determinative influence in the
mind of the jury as to the fact of inducements being offered by

the defendants to alienate Ralph's affection from his wife. They say: "The nature of these declarations, and the accompanying manifestations of affection for the wife and indignation against the parents, *throw light upon the nature, extent, and force of the inducements or threats which must have been held out or made to Ralph Bourne* in order to impel him to treat his wife so cruelly and desert her with an intention never to return." Again, it is said: "They point to the *degree, amount, and kind of persuasion and inducements that must have been held out to Ralph Bourne* in order to induce him to desert his wife."

It is apparent, from the undisputed evidence, that the marriage of this young couple took place with the full consent and approval of the defendants. The plaintiff, before the marriage, was a frequent guest at defendants' home, and sometimes spent the night with them. They were present at the marriage ceremony, and provided a home for the young couple with the declared purpose of ultimately deeding it to them. The mother-in-law spoke in high terms of approval of the new daughter-in-law, stating to one of plaintiff's witnesses that Ralph had married her "because he knew she was a good, pure girl." Both the parents wanted the young couple in their company, and the mother was particularly solicitous to have the companionship and affection of her son's wife. If any criticism can be made of the attitude of the defendants toward their daughter-in-law during the first few months of the marriage, it was for over-zealousness and officiousness for her welfare. They probably were not always wise or discreet, and, according to plaintiff's testimony, were inclined to impose upon the young couple too dictatorial a supervision of their conduct and affairs; but that anything was said or done by these defendants which was not meant in kindness and for the good of both their son and his wife during the first months of their marriage, is not seriously contended.

The plaintiff was eighteen years of age and her husband was twenty-one when they were married in May, 1913. He was the only child of the defendants. There was nothing worthy of serious consideration that occurred in the family to disturb the harmony of any of their relations, particularly as relates to the conduct of defendants, for several months. There had been some criticism, which was neither unkindly

nor perhaps unmerited, regarding the plaintiff's disposition
to "gad," as the witness termed it; and the plaintiff had, on
two or three occasions, been unreasonably resentful of what
she considered officious solicitude of her husband's parents
in her domestic affairs. But nothing serious occurred until
about the 1st of March, 1914, nearly a year after the mar-
riage. The plaintiff was away from her home in Eagle Rock
on one of her frequent visits to her friends in Glendale, when
her husband, who was working for his father in Eagle Rock,
met with an automobile accident. The Ford car which he
was driving overturned, and he was quite badly strained and
bruised. He telephoned his wife, and she, instead of coming
home to him, had him come to her friend's home in Glendale,
where she was staying to dinner. While he was there, his
parents heard of the accident, and were very much concerned,
not knowing how badly he was hurt. They telephoned to
Glendale, and afterward met the young couple at the street-
car when they returned home in the evening. By this time
Ralph, the husband of plaintiff, was suffering a good deal
from his injuries, and could walk only with difficulty. The
party went together to defendants' home, which was near
that of the young people, and there defendants urged them
to come in and stay all night, where they had better accom-
modations, could telephone for a doctor, if needed, and where
the parents could assist in caring for their son. This the
young people refused to do, and a quarrel ensued. The testi-
mony is very conflicting as to what occurred, as narrated by
the plaintiff on the one side and her husband and defendants
on the other. But, accepting plaintiff's version of the event
against the three other witnesses, everybody was wrought up
and excited. The father insisted on the son remaining, and
commanded the daughter-in-law to come along into the house,
and, as she claims, caught hold of her wrists and tried to
draw her in. She also testified that the mother-in-law called
her a snake and a rat, and said that she was not even human.
Plaintiff, in turn, used some rough language, and, it is ad-
mitted, invited her father-in-law to "go to hell." Plaintiff
and her husband eventually went to their own home, and a
few days thereafter, influenced by this quarrel, moved from
there to Glendale, where the husband obtained employment
away from his parents.

This unfortunate episode, which was evidently the result of the nervous strain under which all of them were laboring, and the natural anxiety of the parents over the accident to their son, they not knowing how serious his injuries might be, ought never to have made a breach in the family relations, irrespective of who was the greater offender. That the parents tried to avoid any such result is evident from the fact that they at once commenced to make overtures to the young people, and showed a desire to conciliate them and to heal the breach. This effort continued throughout the several months that plaintiff and her husband remained at Glendale. During all this time plaintiff maintained a hostile attitude toward the defendants, and evidently resented her husband's inclination to a reconciliation. Ultimately, through the repeated advances of the parents, plaintiff and her husband accepted the olive branch, and, after an exchange of visits, an arrangement was agreed on whereby plaintiff and her husband went back to Eagle Rock to live with defendants until their cottage, which had been rented, would be available for their occupancy, the son again taking employment with his father. This was in January, 1915. The parties continued to live together in this way until some time in March, apparently in unusually amicable relations, for two families occupying the same house. About the only criticism plaintiff has to make of the defendants during this period is that the parents were too insistent on being in her company and desiring her society.

Then came the second, and final, serious episode in the relations of these two families—the result of an evident misunderstanding, for which the plaintiff was apparently as much to blame as anyone else. Mrs. Bourne, the elder, had a woman friend—a Mrs. Visel—who frequently visited at her home, and with whom she was talking one day about her daughter-in-law's skill in sewing. She made a remark about her sewing which all parties agree was perfectly harmless, and more in the nature of praise than of criticism. Mrs. Visel repeated this to plaintiff in a way to leave the impression that the mother-in-law was finding fault. Plaintiff then gave her version of the matter to her husband. He, in turn, repeated it to his father; and the father took his wife to task for having made an unkindly criticism of the daughter-in-law. By the time the story got back to the mother, she received the impression that Mrs. Visel had misrepresented the incident and

was trying to make trouble in the family. Returning to her home, she found Mrs. Visel there, and, in the presence of all the parties to this action, called Mrs. Visel to account, and accused her of misrepresentation and mischief-making. The plaintiff took Mrs. Visel's part, and all the women evidently became much excited, and a good deal of harsh language was indulged in; and the elder Mrs. Bourne ordered Mrs. Visel to leave the house. Plaintiff decided to go with her, and the young husband followed his wife. It is entirely obvious that the conduct of the elder Mrs. Bourne in this matter was influenced by her anxiety to keep on good terms with her daughter-in-law. In fact, throughout this period, while the two families were together, there seemed to be an almost feverish solicitude on the part of the parents to cultivate the good-will of the plaintiff; and that it was not entirely on the son's account is shown by the efforts of the mother to have the plaintiff in her company, and to elicit some sentiment of daughterly regard.

This second separation of the families occurred about two years after the marriage of the young people and about four months before the plaintiff was deserted. During all this time the young husband sided with his wife in whatever differences occurred, and was admittedly deeply in love with her, and, according to the wife's testimony, expressed great indignation at anything like a hostile attitude toward her on the part of his parents. If there had been any attempt on the part of the parents to alienate him from his wife, it had, up to this time, been a signal failure.

After this second episode, the young people again moved into apartments of their own, but the son continued in the employment of his father. Friendly relations were not resumed with the plaintiff, although the parents made overtures in that direction by taking the young people products of their home garden, and inviting them to join in auto trips. The plaintiff repulsed these advances, and displayed a spirit of unrelenting hostility to the husband's parents. She evidently, as her husband testifies, resented any approaches to social intimacy with them on the part of their son, and virtually admitted that she insisted upon his giving up all family relations with them. Reading between the lines of plaintiff's own testimony, it is evident that this matter became one of some tension and bitterness between

them, she insisting and he refusing to entirely give up friendly relations with his parents. The following questions and answers from plaintiff's testimony point to these conclusions: "Q. Haven't you told your husband many times that if he did not side with you and give up his parents you would leave him? A. No, sir; not until about a month before he left. Q. Now, you say that it was not until the last month that you lived together that you did tell your husband that he could take a choice between you and the parents? A. I don't know that I ever used those words to him. Q. Well, what was said during the last month about your leaving him unless he would side with you and give up his parents? A. I think one evening Ralph came home . . . and I asked him where he had been, and he said that he had worked late; and I asked him if he hadn't been with his folks, and he finally owned up and said that he had; and I told Ralph that I didn't think he was doing the right thing by me to see his folks and not telling me about it; and I told Ralph that I thought he ought to have some consideration for me. I don't think that I said, 'I will leave you if you don't give up your folks for me.' I am sure I didn't, not in those words." And again: "Q. When was the first time you told Ralph you thought he ought to give up his folks because they were talking about you? A. During the last month or month and a half that we were together. Q. Do you mean to say that you didn't say that to him long before that? A. We talked it over in a general way. I never used those words; just sort of general talk. Q. Well, now, you supposed, did you not, after this scene in the house with Mrs. Visel present, that he had given up his folks entirely, didn't you? A. Not entirely, because he was going to work there, continue work. Q. And you knew, of course, he was going to continue to work with his father, but you didn't think there was going to be a continuation of the social relations between him and his parents? A. I knew there would be no relations between the four of us." The testimony of the plaintiff's husband was that there was, during the last three or four months, bitter and repeated quarrels between them because he refused to give up all affectionate relations with his parents; and the above admissions of plaintiff, and other circumstances shown in evidence, tend strongly to corroborate this.

It is quite evident that, for reasons good or bad, the plaintiff had assumed an attitude of implacable enmity toward her parents-in-law. Indeed, it seems to be on this attitude on her part that plaintiff's counsel largely base their inference that the parents sought to alienate her husband from her. She did not like them. She refused to be reconciled with them. Therefore, they must have resented it and tried to take her husband from her. That is not a fair legal inference, and it finds no support in the evidence. As has been suggested, there is some evidence of isolated criticisms and unfriendly comment by the mother. Mrs. Visel was the principal witness to these incidents, and as she and the elder Bournes were not on speaking terms after the final break between the families in March, whatever she may have heard must have occurred prior to that time, and was, as one might say, condoned by the subsequent reconciliation and era of good feeling between the parties. Mrs. Visel testified that at one time the elder Mrs. Bourne said of the plaintiff that she was a snake, and that she wasn't human. This is the same language that the plaintiff herself testified that her mother-in-law used at the time of the trouble over the automobile accident, and Mrs. Visel locates her conversation at about the same time; so the words used on both occasions probably arose out of the same grievance. Mrs. Visel also testifies that after the quarrel, and while the young folks were living in Glendale, the mother often expressed regret that her son was away from her, and told how unhappy she was; "that it was ridiculous that he was away; that he belonged with them, and that he would come if it wasn't for Marie; that it was her ambition to get him back; that he belonged at home, and that was where she was going to have him if it was the last thing she ever did." She seems to have accomplished this purpose, and succeeded in getting both Ralph and Marie at home, where all of them lived very amicably together for some time; and the means she used to secure the return of her son and his wife were friendliness and conciliation toward both. Mrs. Visel further testified that at the time of the second separation of the families; in the quarrel in which she was involved, the elder Mrs. Bourne accused her of telling lies to cause trouble and accused Marie of telling lies, too, in order to keep her husband's affection, and that Ralph came in during the quarrel

"and tried to bring about peace; he tried to quiet his mother down, and also his wife."

Mrs. McDonald, the plaintiff's mother, testified that on one occasion the elder Mrs. Bourne spent the evening with her and talked about Marie all the time. This was in the winter of 1914, evidently while the young people were living at Glendale. She testifies that Mrs. Bourne said that Marie was not a good housekeeper; that it would have been better for Ralph if he had never married her, and that he would never get along. Mrs. McDonald also testified that she saw the defendant Harry Bourne the day after the trouble over the automobile accident, and that he said: "Ralph was going with another girl at the same time as with Marie, and that he wished Ralph had married the other girl. He said she was not a good housekeeper, and was extravagant, and that Ralph would have been better off if he had not married her."

There may have been some other statements of like nature, but the foregoing is substantially the sum total of any expression, by act or word, prior to the date of the separation of plaintiff and her husband, tending to show malice or ill will on the part of the defendants toward the plaintiff. This and the two quarrels they had, and the fact that the plaintiff herself had given them little cause to feel kindly toward her, is the sole basis for the inference that the defendants had willfully and maliciously alienated their son's affections from his wife or influenced him to desert her. There is no direct evidence whatever that they ever, by any word or conduct directed to or in the presence of their son, attempted to influence his relations with his wife.

There is only one other circumstance in this unfortunate family tragedy tending to connect the defendants with the separation of their son from his wife. On the 10th of July, 1915, the desertion took place. Ralph Bourne, in the absence of his wife from home on that day, went to their apartment, packed up his belongings and some of the wedding presents he and his wife had received at their marriage, and departed. He took an east-bound train for New York, and did not return to Los Angeles until about the time of this trial. It is admitted that on the 7th or 8th of July he disclosed to his parents his intention to leave, and asked for money for his trip. He and both the defendants testify that the parents objected to his separation from his wife, and urged upon him

his duty to his marriage relations. There is no evidence to the contrary, unless such inference may arise from the fact that they assisted him in leaving. As a matter of admitted fact, the father furnished him the money for his railroad fare and expenses, and on the day that he left took him in his automobile to a point near where Ralph and his wife lived and waited there for him to get his belongings from the apartment. The desertion, if the plaintiff's story is true, was cruel and indefensible. Even in the light of the husband's explanation, it was cowardly. [3] But if the determination to abandon his wife was the result of the husband's own volition, and not influenced by any willful or malicious act of the defendants, they cannot be held responsible because they assisted him in carrying out his purpose. They had a perfect legal right to side with their son in this separation, if it was done in belief of his story of the cause of his leaving and in sympathy for him, and not because of malice and ill will toward his wife. The New York court of appeals, in the case of *Servis* v. *Servis*, 172 N. Y. 438, [65 N. E. 270], says: "Of the absolute right of a father to furnish money for the support of a son who has for reasons good or bad determined to abandon his wife, there is of course no doubt; a right that he may exercise without being subjected to respond in damages, provided its exercise be not part of a general scheme having for its object the alienation of the husband's affections from the wife and her abandonment by him."

The plaintiff's cause of action is for alienation of her husband's affections and inducing the desertion. If the state of mind which induced this desertion was caused by the willful and malicious influence of the parents, they would be liable, irrespective of whether or not they assisted him in his plans to go away. If his loss of affection for and determination to leave his wife arose from their own domestic troubles, whether over the wife's implacable purpose to break up his relations with his father and mother or otherwise, and without malicious interference of the defendants, they are not legally responsible, no matter what assistance they gave him in carrying out his purpose; and no presumption of a bad motive arises from the mere fact that they gave him such assistance. (*Reed* v. *Reed*, 6 Ind. App. 317, [51 Am. St. Rep. 310, 33 N. E. 638]; *Trumbull* v. *Trumbull*,

71 Neb. 186, [8 Ann. Cas. 812, 98 N. W. 683]; *Cripe* v. *Cripe, supra.*) **[4]** The marriage of a child does not terminate the right of the parents to interest themselves in his or her happiness and welfare; and they do not stand on the footing of a stranger to the domestic relations when such a charge as is here involved is brought against them. So long as they, in good faith, act for what they believe is their child's welfare, no matter how mistakenly, and are not moved by malice or ill will toward the partner to the marriage, there is no liability, even where they use their influence to bring about a separation.

**[5]** The relations of a parent, particularly of a mother to her son, are scarcely less sacred that the relationship between husband and wife, and are usually more unselfish. The home of the parents is the natural sanctuary of the children in cases of marital infelicity. It is not the policy of the law to leave this door open only at the risk of involving the parents in litigation for alienation of affection. No presumption arises of malicious interference because the parents take sides with their child, unless it affirmatively appears that it is done in bad faith and from ill will toward the other party. A mother has a right to fight to retain the affection and society of her boy so long as she does not try to interfere with his duty to his own domestic relations; and any wife who, without serious cause, interposes a barrier to her husband's affectionate regard for his mother, deserves to lose his love. We find no evidence in this case of anything but a spirit of friendliness and a desire to conciliate the regard and affection of this plaintiff on the part of defendants, for the first two years of her marriage with their son, a spirit which, if interrupted, was not broken by the one or two unfortunate quarrels, incidents for which the plaintiff's suspicion and unfriendly attitude toward her parents-in-law were largely responsible. And after the quarrel in March, 1915, some three or four months before the desertion of plaintiff by her husband, there is no reason to believe there was a day when the defendants would not gladly have welcomed a reconciliation with their daughter-in-law. They made every attempt in that direction that self-respect would permit, and their advances were coldly repulsed. **[6]** It is not unlikely in moments of resentment they said harsh and unkind things about her; but that fact

alone does not justify an inference that they violated the laws of God and society by trying to break up the marriage relation of these young people.

It must be remembered that there is no direct evidence that they did try to influence their son in this regard, but, on the other hand, the son and both defendants explicitly deny that any such influence was ever attempted; and each of them testified that the defendants, when told of his intentions, advised him to remain with his wife. The husband's explanation of the estrangement from his wife is that it resulted from constant quarrels over the wife's insistence that he give up all social relations with his father and mother. There is at least no evidence to rebut the statement of the defendants that they were so informed, and so believed, when they finally consented to aid their son in the separation. [7] It is a cruel and reprehensible circumstance that they permitted this thing to happen without offering any aid or comfort to the deserted wife. But, however unjustifiable this may seem, even in view of the plaintiff's hostility toward them, it was the violation of no legal duty, and in itself raises no inference that they instigated his desertion. It is sought to connect the mother with the preparation of the note left by the husband to inform the plaintiff of his desertion. Ralph Bourne and both defendants deny that she had anything to do with it. The only evidence tending to show that the mother had any part in this note is a single word written on its margin, which the plaintiff testified was in the handwriting of her husband's mother. A comparison of this with other exhibits showing the same word in the admitted handwriting of the mother alone seems to be a sufficient disproof of this testimony. But, in any event, it is an immaterial circumstance. The note was written after the determination of Ralph Bourne to leave his wife had been formed and declared, and at the most would indicate an acquiescence and co-operation in his avowed purpose, without being of the slightest value in showing that the defendants had influenced his determination in the matter, or in discrediting their testimony that they relied on the representations of their son as to the cause of his separation from his wife. The jury may have been justified in disbelieving the testimony of Ralph Bourne as to the cause of his leaving his wife, but there is no legal ground for rejecting the testimony

of the defendants that they believed their son's account of the matter. Their testimony in this regard is not impeached, either by direct evidence or by any legitimate inference or presumption from the known relations of the parties, or the circumstances of the case. (*Maupin* v. *Solomon*, 41 Cal. App. 323, [183 Pac. 198].) [8] While the jurors are the sole judges of the weight and sufficiency of the evidence, their province in receiving or rejecting evidence, as they were by the court instructed, is not arbitrary, but is to be exercised with legal discretion and in subordination to the rules of evidence. [9] Two conclusions must be established by plaintiff in this case to support a verdict against the defendants: First, that they knowingly and willfully influenced their son to withdraw his affection and companionship from his wife, the plaintiff; and, second, that this was done in a spirit of malice and ill will toward the plaintiff. The circumstances proved and attempted to be proved, of quarrels with and criticism of the plaintiff, and assistance given to the son after he had announced his plans to abandon his wife, do not prove or even raise an inference of act or effort to alienate his affections from her. It may be conceded that if this primary fact was proved, these unkindly acts and expressions might be sufficient to support a finding of malicious purpose; but in the absence of any evidence of the primary fact, there is no foundation upon which any proof of malice or ill will can rest.

Respondent's counsel argue that the acts of the parents disclose a hostile feeling toward their daughter-in-law, that this feeling evidences a motive prompting them to alienate the son's affections, and that, therefore, the existence of such motive is a circumstance that may justify the inference that the parents did use persuasion and inducement to alienate their son's affection from his young wife. Seeking to draw an analogy between a case such as this and a prosecution for crime, counsel say: "Men are hung for less evidence than this. . . . Jones has a grudge against Smith, and Smith is found murdered; Jones is shown to have had the opportunity to commit the crime; his gun is found in the vicinity of the murder bearing evidence that one shot had been fired; at the trial he attempts to establish an alibi; the jury convicts him and the court upholds the conviction, and no reasonable man questions the fact that the evidence

is sufficient to establish all the elements of the crime.'' The analogy is entirely unsubstantial. In the supposititious criminal case instanced by counsel, a crime has been committed, the *corpus delicti* is established, and the question is, Who did it? Among other circumstances tending to point the accusing finger of suspicion toward the defendant is the fact that he had a motive for committing the crime. If the body of the dead man had been found under circumstances that pointed to suicide, the mere fact that the accused had a motive for the commission of murder would not show that the crime of murder had been committed, or established the *corpus delicti.* [10] So here, the fact that the parents may have had a grudge against their daughter-in-law, or a motive for alienating their son's affections, would not suffice to prove that his love for his wife waned and flickered out as the result of his parents' conscious and willful influence or persuasion, and not as the result of some innate cause born within his breast unassisted by any acts on the part of his parents, done for the purpose and with the intent of bringing about that condition of heart within him.

[11] Conceding its full probative force to all the evidence in behalf of the plaintiff, and disregarding, as we must, the denials and contrary testimony of the defendants, the evidence is insufficient for this purpose. The evidence here would not justify a verdict against strangers, much less as against parents. [12] The law places the parents of a married child on a much more favorable basis than that of a stranger to the family relations, in actions for alienation of affection. All presumptions in such cases must be that the parents will act only for the best interests of the child. (*Trumbull* v. *Trumbull, supra; Oakman* v. *Belden,* 94 Me. 280, [80 Am. St. Rep. 396, 47 Atl. 553]; *Multer* v. *Knibbs,* 193 Mass. 556, [9 Ann. Cas. 958, 9 L. R. A. (N. S.) 322, 79 N. E. 762]; *Reed* v. *Reed, supra; Tucker* v. *Tucker,* 74 Miss. 93, [32 L. R. A. 623, 19 South. 955]; *Hall* v. *Hall,* 174 Cal. 718, [164 Pac. 390].) In *Hall* v. *Hall, supra,* our supreme court states the rule as follows: ''Having in contemplation the natural solicitude of the parent for the child, and the well-nigh universal experience of mankind that parents in their conduct toward their children are actuated by high and disinterested motives involving the sacrifice of their own interests for the welfare of their child,

it is not to be lightly inferred that the language or conduct of such a parent toward a child is prompted by evil or malicious motives. Therefore, to establish such willful and malicious alienation, the measure of proof must be extremely high,'' and ''every presumption is that the parent acted for the best interests of the child.'' There is a striking parallel between the circumstances and relations of the parties as set forth in the opinion in the foregoing case and those of the present case; although the evidence of attempts by the parents of plaintiff's husband, in the case cited, to bring about a separation was much stronger than that against the defendants here. The court, however, held the evidence insufficient to sustain the verdict for plaintiff. There were other elements entering into the decision in the Hall case, and in the end it was the wife who left the husband; but the gist of her action was that her husband's affections had been previously alienated by the influence of her husband's parents. The decision in its entirety remains a convincing authority against the verdict of the jury in this case. The evidence in the case at bar is insufficient to support the conclusion either that any acts or representations of the parents alienated the affection of plaintiff's husband, or that such acts and representations as were shown in evidence were intended to alienate the husband's affections, or were done or made in a spirit of malice toward the plaintiff. It is difficult to escape the conviction that the jury, consciously or unconsciously, was influenced in its verdict by the hearsay declarations.

Appellants further urged as ground for reversal that there is no evidence in this case to justify holding the defendant Harry S. Bourne as a joint tort-feasor with his wife, even if the evidence is sufficient to support a verdict against the latter. We think this point is well taken. As has been pointed out, not one hostile word or act tending to show malice or ill will on the part of the father against his son's wife, or any effort on his part to bring about a separation, appears in the record, excepting the circumstances as testified to by plaintiff's mother; that after the quarrel and removal of the young folks to Glendale, incident to the automobile accident, the father-in-law said that he was sorry his son had not married another girl with whom he had kept company, and that Marie, the plaintiff, was not a good housekeeper. It is true the father-in-law was a party to the quarrel

the night of the automobile accident, and is alleged by plaintiff to have caught hold of her hands on that occasion in an attempt to compel her to come into the house. It would appear from his testimony that he was much concerned to get all the parties into the house to terminate a disgraceful scene on the street; but, in any event, this incident was entirely fortuitous and incidental, and it appears from the subsequent actions of all concerned, and particularly of the defendants, that it was fully condoned by subsequent reconciliation and good feeling between the two families. He had no connection whatever with the second quarrel, or with any subsequent events, excepting the assistance he gave his son at the time of his leaving his wife; and, as already pointed out, this was given under protest, and in the light of his son's representations that he had made up his mind to leave, and if his father did not help him he would get away as best he could. There is nothing to indicate that the father was in any way a party to, or countenanced or encouraged, the temperamental and at times apparently hysterical outbreaks of his wife.

[13] We are of the opinion, too, that there was error in the admission by the court, over defendants' objection, of plaintiff's testimony of declarations of her husband as to his father being worth seventy-five thousand dollars. This was clearly hearsay, had no legitimate value in proving the state of the husband's feelings, was contrary to the testimony of the defendant parent—who swore that he was not worth over fifteen or twenty thousand dollars—and quite probably influenced the comparatively large amount of damages found by the jury.

Judgment reversed.

Finlayson, P. J., concurred.

THOMAS, J.—I regret most sincerely my inability to secure the approval of my own conscience, which is absolutely necessary, in order to agree with my sincere, able, and distinguished associates in their conclusion as expressed in the foregoing opinion. I therefore dissent.

In view of what appears to me the importance of this case, coupled with the fact that this presents our first disagreement, I submit the case as I see it, rather than, as is customary, to discuss only the points upon which we disagree.

Plaintiff, in her amended complaint, alleges the activity of both defendants—her husband's father and mother—and their maliciousness in bringing about the alienation of affections and resultant desertion. Defendants, by their answer, deny "that they have had anything whatever to do with the depriving of plaintiff of the attention or support or comfort or society or the aid or assistance of her husband in any manner whatever."

The record here discloses, among other matters, the following facts: That plaintiff married Ralph Bourne on May 20, 1913, when she was eighteen and Ralph twenty-one years of age; that Ralph loved her when he married her, and continued to so love her at all times up to a date approximately that of the desertion, to wit, July 10, 1915; and that she was a devoted and loving wife. That on the date last mentioned Ralph told his wife he was going to work, and directed her to go to Los Angeles, borrow enough money from her sister to purchase a pair of shoes and some theater tickets, and meet him at 6:30 P. M. at the Hayward Hotel, in Los Angeles; that plaintiff did as directed; that shortly after plaintiff left home to carry out the plan as above stated Ralph and his father, Harry S. Bourne, drove up in the defendants' automobile to within one block of the apartment house in which Ralph Bourne and his wife were living, stopping in the rear of the apartment house, and Ralph, alighting from the automobile, went into his apartment, carrying a valise which had been furnished for that occasion by his parents; that he there encountered his mother-in-law, to whom he misstated his errand, and then proceeded to change his clothes; that he at that time left for his wife a certain "note," which, in words and figures, is as follows:

"July 10th, 1915.

"I simple am sick and tired of this life, so am leaving for good. I am taking the silver, and consider this a fair division, as you have your ring, and a couple of hundred dollars' worth of furniture.

"RALPH.

"P. S.—Don't blame my folks, as they are ignorant of my whereabouts."

On the back of this note appeared the following memorandum: "Silver, blue suit, shoes, collars, razor and strop, tooth brush, brushes, underclothes, jack bowl." The articles last

enumerated, and which he took away with him, had been given to Ralph and his wife as wedding presents. Having effected his "fair division," he returned to his waiting automobile, had lunch with his parents, and later in the day left Los Angeles for New York, his parents having furnished him the necessary railroad and Pullman tickets, together with sufficient cash to pay expenses. The plan to thus desert his wife was known by his parents as early, at least, as the 7th or 8th of July; but, notwithstanding this fact, it was kept an absolute secret from the plaintiff and her mother until after the foregoing was consummated. At the appointed time plaintiff was at the Hayward Hotel, carrying out her part of the plan implicitly, as directed by her husband; but he did not meet her. Instead, he was aboard a fast-moving train, traveling away from her as fast as steam could take him. Neither defendants did anything to communicate the fact of his departure to his wife. The defendant Hope Bourne was asked: "And did you notify her on the next morning after the desertion as to where Ralph had gone or why he had gone?" to which question she made the following answer: "Why should I? Why didn't Marie come to see me? I would have been glad to have seen her." It will be observed that this was not an answer, but an evasion of the question. And again she was asked: "And you never made any effort to see what was becoming of her after her husband left her in this manner?" and the following was her answer thereto: "I guess Marie is capable of taking care of herself."

One hundred and eighty pages of a two hundred and sixty page opening brief is directed by appellants to the discussion of the insufficiency of the evidence to support the verdict. Many points are urged for a reversal. I shall discuss only those which I deem essential for my present purpose.

The verdict is attacked as unsupported by the evidence. I am satisfied from an examination of the record that there was sufficient evidence—although not as weighty as might be desired—to justify the verdict, and hence to support the judgment; and this even though we disregard the declarations of the husband to his wife, without the presence of the parents. In discussing the sufficiency of the evidence, appellants urge that the court erred in permitting plaintiff to state, over defendants' objection, declarations claimed by Ralph to have been made by his parents to him concerning his wife, etc., in

an effort to induce him to leave her, and which declarations were made to the wife out of the presence of the defendants or either of them, the objection being general in its terms, and on the additional ground that it was hearsay as to these defendants. The learned trial judge, in referring to these declarations and in overruling the objection, said: "Of course, it is undoubtedly the rule that they are incompetent for the purpose of proving the existence of any fact which is included in those declarations, and the jury should be so instructed; but I take it, from the authority quoted by Mr. Ashburn and from consideration, that the general rule that, where the state of mind of the husband of the plaintiff be one of the things in issue, any declarations of his are verbal acts in so far as they tend to show that state of mind, and it is admissible for that purpose, and that purpose only." Right there and then the court admonished the jury accordingly; and with this view of the trial court I agree. (*Cripe* v. *Cripe*, 170 Cal. 91, [148 Pac. 520].) The same is true as to the evidence of Ralph as to what he told his wife he thought his father was worth. It was offered and received for the limited purpose of showing the state of Ralph's mind. It is the usual rule that, where testimony such as is now under discussion is sought to be introduced, to explain the purpose for which it is offered, and thus make it permissible for a limited purpose only; and, as we have already seen, this was done in the present case, and the trial judge, with great care and skill, and that no confusion might result therefrom, admonished the jury, as we have already seen. "It is a well-established rule that if evidence is properly admissible upon the issues presented, it cannot be excluded because it may have ulterior or collateral effects detrimental to one of the parties." (*Vallejo etc. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 562, [147 Pac. 238], and cases there cited.) In view of the fact that the evidence objected to was competent for the purpose for which it was received, I fail to bring myself to the place where I must conclude that the jury willfully disregarded the court's instructions and admonitions in this respect. If any construction which the jury might have placed upon such evidence, concededly properly received for the stated limited purpose, be inimical to defendants' interests, that fact is not due to the jury or to the court, but to the state of the rules of evidence as they existed at the time of the trial. So believing,

I doubt the power of this court on appeal to disturb the verdict.

I believe the case of *Cripe* v. *Cripe, supra,* decisive of this phase of the case, notwithstanding that at first blush it would appear that the case of *Barlow* v. *Barnes,* 172 Cal. 98, [155 Pac. 457]—a later case—would seem to be in conflict therewith. This, I think, is more apparent than real. Respondent's argument here appeals to me. When considered in all its aspects, I think it not in conflict with the Cripe case, for a different point is decided. In the Cripe case it was held that, "in an action for alienating the affections of a husband or wife, the state of the feelings of such husband or wife is material." In the Barnes case the court held that the guilt of the defendant cannot be proved by declarations of the alienated spouse as to the acts or statements of defendant. From the language of the court, I cannot conclude that it intended to go any further than that or to announce a rule contrary to that applied in the Cripe case. In the Barnes case there were two alleged causes of action—one for alienation of the wife's affections and the other for damages for alleged criminal intercourse with the wife. When the letters in that case, objections to the introduction of which were sustained by the court, were sought to be introduced, there was no statement or explanation made to the court that they were offered for any limited purpose; and, so far as that case was concerned, such limited purpose would appear to have been to show *a state of mind or feelings* on the part of the alleged alienated spouse at the time the said letters were written, and thus to support the first cause of action, and in the absence of such explanation their reception might reasonably have led the jury to consider them in connection with the second alleged cause of action. In my opinion, the ruling of the trial court, under the facts as there presented, was absolutely correct. In the Cripe case, as in the case at bar, the offer of the letters and the declarations was accompanied by such explanation, the court, in overruling the objections in this case, so stating, and at the same time admonishing the jury as already indicated. Indeed, in the Barnes case, as one of the several propositions advanced, it was argued to the trial court by counsel for appellant "that they [the letters] were material to the issues under both causes alleged is apparent from the language of the letters, showing that her affections were alien-

ated from her husband to and by the defendant beyond all question, and tend to show criminal conversation." And again: "We think that they are both competent to show that the poison is there and that the defendant and his wife were parties to the wrong and still burning in their lust." Under this attitude, the correctness of the court's ruling in that case I think not debatable.

One other point in the Barnes case needs consideration. The supreme court in that case used the following language: "They [the letters] were not admissible under section 1881 of the Code of Civil Procedure," and cites, among others, the case of *Humphrey* v. *Pope,* 1 Cal. App. 374, [82 Pac. 223], decided July 25, 1905, and at a time when that section did not contain its present exception permitting a husband or wife to testify in such a case as the one at bar. The Barnes case was decided by the supreme court on February 10, 1916. The section referred to was amended, as indicated, in 1911. It is apparent, therefore, that the Cripe decision, as well as the fact that section 1881 of the Code of Civil Procedure had been so amended, was not called to that court's attention, as the court uses the specific language last above quoted, and follows the Humphrey case. In view, therefore, of the exact question which was presented to the court in the Barnes case for its decision, and confronted, as we are, with the array of facts just referred to, there is, I think, no warrant for construing that decision as in conflict with the Cripe case on the point involved and now under discussion in the case at bar. This construction is in line, in my opinion, not only with the doctrine laid down by our own supreme court, but with what seems to me the overwhelming weight of authority of this question.

Certain instructions given by the court to the jury are objected to by appellants here. "If all the instructions taken together, and not being inconsistent with each other or confusing, give to the jury a fair and just notion of the law upon the point to which they are addressed, it is sufficient." (*Weaver* v. *Carter,* 28 Cal. App. 241, [152 Pac. 323]; *Hamlin* v. *Pacific Elec. Ry. Co.,* 150 Cal. 776, [89 Pac. 1109]; *Taylor* v. *Pacific Elec. Ry. Co.,* 172 Cal 638, [158 Pac. 119]; *Parkin* v. *Grayson-Owen Co.,* 25 Cal. App. 269, [143 Pac. 257].) Speaking generally, I think the instructions given by the court, and particularly including those to which appellants ob-

ject, ample, and as favorable to appellants as they properly
could be on the questions presented. Especially is this true
when the instructions objected to are considered in connection
with and in the light of the other instructions given. For
instance, appellants object to the following instruction given
by the court to the jury: "If you should find from the evi-
dence that the defendants, or either of them, willfully and
materially enticed or induced the husband to desert and aban-
don the plaintiff, then you will be justified in allowing dam-
ages to plaintiff for the sake of example and by way of
punishment of said defendants, or either of them, in addition
to her actual damages, as to which you have already been in-
structed, provided the total amount shall not exceed the sum
of fifty thousand dollars," on the ground that the complaint
contains no prayer for punitive damages, and, hence, because
of absence of any specific mention of exemplary damages in
the complaint, was unwarranted. An examination of the rec-
ord here discloses no evidence that an instruction on punitive
damages was requested by the appealing defendants. On the
contrary, it affirmatively appears, in my judgment, that the
contention which is now urged by appellants is that that
species of malice which was defined by the court as malice in
law will not warrant an award of exemplary damages. This
seems to be the first time and place that this point is raised
by them. The record shows that appellants insisted all
through the trial that plaintiff could not establish a right to
compensatory damages except by proof of the existence on the
part of the defendants of a spiteful and rancorous disposi-
tion toward the plaintiff, and that no award of punitive
damages could be made in any event. No distinction was
pointed out between the two. The point urged here, there-
fore, as is now for the first time obvious, is that the court
failed to recognize this distinction. This, I think, is now un-
availing to them. The rule is that a party who desires in-
structions to be more specific, or to incorporate distinctions
not contained therein, should request such instructions or be
foreclosed from complaining if he fails so to do. (*Henderson*
v. *Los Angeles Traction Co.,* 150 Cal. 689, [89 Pac. 976];
*Liebrandt* v. *Sorg,* 133 Cal. 571, [65 Pac. 1098]; *Scott* v.
*Wood,* 81 Cal. 398, [22 Pac. 871]; *Viera* v. *Atchison etc. Ry.
Co.,* 10 Cal. App. 267, [101 Pac. 690]; *Weaver* v. *Carter,
supra; Hardy* v. *Schirmer,* 163 Cal. 272, [124 Pac. 993].)

Appellants call attention to the cases of *Hall* v. *Hall,* 174 Cal. 718, [164 Pac. 390], and *Van Tassell* v. *Heidt,* 33 Cal. App. 234, [164 Pac. 817], both having been decided since the opening brief herein was filed. In my opinion, neither of these is controlling, under the facts disclosed here. In the latter case the following is gathered from the opinion of the court: That the plaintiff brought an action against the parents of a young woman for having alienated from his wife, the plaintiff, her husband's affections. This husband had illicitly sought the regard of the young woman, but there was no sufficient evidence to support the findings and judgment against defendants. In the Hall case, an examination of the opinion will, I think, disclose that there was in fact no evidence to show an attempt to alienate the husband's affections. Indeed, there is a positive showing that if any such attempts had been made by them, they had wholly failed. Further, the facts disclosed by the record show that the wife in that case was the malefactor, and that she was the one who had herself abandoned her husband. She was strong on profession, but mighty short on redemption. She was very much concerned about attending ''a meeting of the Young Women's Christian Association,'' but not much interested in applying to her daily walk and conversation the wonderful principles taught by that great, benevolent, and helpful institution. I think the court had ample basis for its statement when, in referring to the case, it said that ''its evidentiary foundation is airy nothingness, not even the baseless fabric of a vision.''

In the case at bar the conditions, I think, are just as much the other way. The love and affection of the husband for his wife, as disclosed by the record, continued almost, if not quite, to the date of the desertion, and the record, disregarding the statements of the young husband entirely as hearsay, contains evidence of defendants' duplicity—as I read it—the details of which need not be recited here. There is no doubt but that the rule is that the decisions require a much stronger case to be made where the defendants are, as here, the parents of the alleged alienated spouse—as is held in *Cripe* v. *Cripe, supra,* and cases there cited; but in the case at bar, in my opinion, this requirement has been fully met.

The point is made that the verdict is excessive. With this view, also, I do not agree. If the defendants wanted the verdict to sever the punitive damages, if any were awarded—as

may have been possible under the court's instructions—from
the compensatory damages, they should have asked for such
severance; but they are now estopped for having failed so to
do. (*Davis* v. *Hearst*, 160 Cal. 143, [116 Pac. 530].) I am
not able to conclude from the record here that the verdict is
"so plainly and outrageously excessive as to suggest, at the
first blush, passion or prejudice or corruption on the part of
the jury." (*Hale* v. *San Bernardino etc. Co.*, 156 Cal. 713,
[106 Pac. 83]; *Nolen* v. *Engstrum Co.*, 175 Cal. 464, [166
Pac. 346].) Damages for alienation of affections in such a
case as the one at bar include the loss of aid, support, protec-
tion, comfort, and society of the husband, together with com-
pensation for the humiliation and suffering inflicted upon the
deserted wife. (Sutherland on Damages, 4th ed., sec. 1285.)
It has been held that the recovery may include such elements
as loss of support, and also mental anguish and disgrace.
(*Nevins* v. *Nevins*, 68 Kan. 410, [75 Pac. 493]; *Dunham* v.
*McMichael*, 214 Pa. St. 485, [63 Atl. 1007]; *Nichols* v. *Nichols*,
147 Mo. 387, [48 S. W. 947]; *Stanley* v. *Stanley*, 32 Wash.
489, [73 Pac. 596].) On principle, I am unable to see why
there is not a much wider field for legitimate expression in
such a case as this than in an action for wrongful death of a
husband, for the reason (1) that in a case like the one at
bar, the jury has the right to impose punitive damages, and
(2) to make awards by way of solicitation for injured feel-
ings—which concededly cannot be done in case of death—
while it does embrace the same elements as in death. Judg-
ments as large, and even larger than the one here involved,
have been sustained in cases similar to the case at bar. (*Gross*
v. *Gross*, 70 W. Va. 317, [73 S. E. 961]—twelve thousand five
hundred dollars; *Lockwood* v. *Lockwood*, 67 Minn. 476, [70
N. W. 784]—fifteen thousand dollars; *Williams* v. *Williams*,
20 Colo. 51, [37 Pac. 614]—twelve thousand five hundred dol-
lars; *Hendrick* v. *Bigger*, 151 App. Div. 522, [136 N. Y.
Supp. 306]—thirty thousand dollars; *Speck* v. *Gray*, 14
Wash. 589, [45 Pac. 143]—fifteen thousand dollars; *Waldron*
v. *Waldron* (C. C.), 45 Fed. 317—seventeen thousand five
hundred dollars; *Williamson* v. *Osenton*, 220 Fed. 653, [136
C. C. A. 261]—thirty-five thousand dollars.) As a matter
of fact, the injuries to a good wife, whose husband, thereto-
fore loving, kind, and faithful, has been alienated from her,
is, in my opinion, more serious than that of a wife whose

husband has been negligently killed. In case of death she has no humiliation, no feeling of disgrace, no injured feeling; while in a case like this, she not only has all these, but in addition thereto is sometimes subjected to suspicion and humiliation in the eyes of her friends, together with the added feeling of shame that her husband has sold her for "a mess of pottage," and has shown himself to be "yellow" through and through; all of which, to a woman who loves her husband, is far worse than to have him removed by death.

Appellants argue that if this judgment is upheld and they are called upon to pay the same, that it means the annihilation of their meager fortune at a time in life when a new start is fraught with unpromising prospects. It is to be regretted that due consideration was not given to this phase of the question by defendants before the perpetration by them of the acts disclosed by the evidence here. It is, indeed, too true that "the way of the transgressor is hard." Helen Bosanquet, in referring to "the family," said: "It is greater than love itself, for it includes, ennobles, makes permanent, all that is best in love. The pain of life is hallowed by it, the drudgery sweetened, its pleasures consecrated. It is the great trysting place of the generations, where past and future flash into the reality of the present. It is the great storehouse in which the hardly earned treasures of the past, the inheritance of spirit and character of our ancestors, are guarded and preserved for our descendants. And it is the great discipline through which each generation learns anew the lessons of citizenship, that no man can live for himself alone." The record here discloses beyond question, I think, that by the saying and doing of those things said and done, these defendants transgressed even that great solicitude which the law entertains in behalf of parents when it requires a stronger case to be made against them than is necessary to be made against a stranger, and rendered highly improbable, if at all possible, the erection, not to say the maintenance, of such a home by the husband and wife here involved.

My associates refer to the "note" left by Ralph. There was conflict in the evidence on that point. The jury resolved that conflict in favor of the plaintiff. Confronted by this fact, I fail to understand the authority of this court to interfere with the conclusion of the jury.

Reference is also made to the fact that respondent's counsel argues to this court—although not suggested in the court below—that the declarations of the husband of plaintiff to her, without the presence of the elder Mr. and Mrs. Bourne, emphasize their force as a determinative influence in the minds of the jury, etc. I think this argument of counsel unnecessary. If it. be a fact, it is not so because of counsel, jury or judge, as heretofore stated.

If it be a fact that the elder Mr. and Mrs. Bourne did in fact endeavor to get their son away from his wife, then those of us who have had experience in the trial of such cases know how stealthily the disintegrating work is done and what subterfuges are resorted to. It is not the usual thing to have the strongest kind of evidence. It is well known that the sulky mood, the insolent look, the gloomy manner, etc., of the person guilty of such conduct often means as much, and sometimes more, than the overt acts or statements. That such a condition existed in the case at bar is, I think, not an unfair inference from this record. I am not unmindful of the fact that the law is very solicitous for the parents in such a case as this, and that it encourages keeping "the light in the window" for the return of the erring son or daughter. Yet this solicitude does not go so far as to countenance the willful breaking of a lamp burning in another's window that the erring child may see the light in his or her parent's window more clearly. Nor am I unmindful of the fact that sometimes in such cases as the one at bar the plaintiff is an adventuress, pure and simple, seeking, as it were, whomsoever she might devour. In this case I see nothing that even points to such a conclusion. There is, in my opinion, no evidence in this record to impugn plaintiff's motives or good faith.

That the family, as such, is the basis and the unit of society, is, perhaps, no longer questioned; that it is the foundation upon which our civilization rests is no longer debatable. That whatever undermines the integrity of the home will eventually produce the downfall of that social and political institution which we call government, is now quite generally conceded. That there is becoming more apparent each year evidences which point unerringly, it would seem, to the growing instability of the family, I think, cannot be denied. That it is challenging the attention and the serious

43 Cal. App.— 35

consideration of thinking men and women the world over is no longer a secret. The problem of the family, as I see it, is indeed the problem of the human race. The family is the most important fundamental institution of humanity. It is the great conserving agency in human society, preserving and transmitting from generation to generation both the material and spiritual possessions of the race. And yet our politicians, even our statesmen, so frequently occupied with questions of party interests, it would seem, have failed to proclaim, indeed, perhaps, to notice, the significance of the position. Shall the courts be also weighed in the balance and found wanting? God forbid! Probably no branch of our government comes into closer contact with this sacred institution—the family—than the courts. As such they have never yet failed in protecting the rights of the downtrodden and the oppressed. They insist upon the equal rights of all. They have been called, and they really are, the bulwarks of our liberties. Capital and labor both come to them; and they do not come in vain—unless with unclean hands. They will not fail to protect this greatest of all human institutions.

Marriage, by its nature, establishes social relations; hence, society is regarded as a third party thereto. This is the basis upon which the state erects its authority to define the qualifications of the persons who marry, the terms, rights, and obligations of the marriage contract, and for what causes and in what manner it may be terminated. The interest of corporate society in the institution of marriage increases in proportion as it is realized how deeply the welfare of the social organism is affected by the uniting of individuals in family relations. Whenever the fundamental importance of marriage to society as a whole is adequately recognized, there is no disposition to rail against the increasing tendency of the state to exercise the most careful surveillance over its procedure, and it becomes that our modern social development demands that in the absence of that paternal authority which characterized the colonial period of our history, the state itself should exercise a control as nearly approximating it as possible.

While this is not an action for divorce, still, while discussing the present instability of the family, and in this way supporting my argument here for the faith that I have in my conclusion in the case at bar, will it be out of place to

suggest that probably nowhere is this instability so much in evidence as in the divorce courts? If I am correct in this, then whose duty is it to call to the attention of the people generally—whose servants the courts are—the terrible moral cancer gnawing at the vitals of this institution and eventually striking at its very base? Our government, in its 1910 census, disclosed the fact that for every twelve marriages solemnized one was dissolved by the surgery of divorce; while in its report on marriage and divorce for 1916, the ratio was one to nine—an increase of twenty-five per cent in six years! According to the report last referred to, it is disclosed that the ratio of divorces to the marriages solemnized was one to every one and one-half for Nevada and one to every two and one-half for Oregon; while it is one for every five and one-half for our own state. For more than fifty years divorces have steadily increased three times as fast as the population. Between the years 1870 and 1916, both years inclusive, according to our own government reports, the number of divorces per one hundred thousand of the population was as follows: 1870, 28; 1880, 39; 1890, 53; 1900, 73; 1906, 84, and for 1916 it had gone to 112. In less, therefore, than fifty years this evidence of the instability of the family and the existence of this moral cancer on the body of society has increased, per one hundred thousand of our population, from 28 to 112, or exactly four hundred per cent. The relation of such facts in connection with a case like this may subject the author to the charge of being sensational; but he answers that the only sensational thing about it is the fact itself. It may subject him to the charge of having had something to do with turning on the light, but, under God, he is not responsible for what that light reveals.

Is not this condition destructive of the family and does it not strike at the very foundation upon which our government stands? Is it not true that the nation whose family life decays, rots at the core and dries up the springs of all social and civic virtues? Is it not un-American and erroneous to suggest that courts should ignore such facts when considering such cases as the one at bar? Is it not a matter of common knowledge among mature men and women that there is no time in the world when young people should not be interfered with in their domestic affairs like the first two or three years while they are adjusting themselves to

each other? If these questions are not impertinent or irrelevant, then it seems to me inevitable that if there was *any competent evidence* to support the verdict, that it should remain undisturbed, not only because of the interests of the parties directly involved, but also on the ground of public policy. I think there is sufficient evidence to support the verdict.

As I see it, anything that in any way—even though that be an overzealous father or mother, or both—injures, or even tends to injure or undermine the family, is inimical to the institutions of our country and the best traditions of our people. It requires no "wise men from the East," nor those with prophetic vision, to see that, if persisted in, it is no long road that must be traveled until governments themselves fall and our vaunted civilization passes into history.

When, therefore, we are confronted with a condition of such vital public importance as disclosed by the statistics referred to, coupled with evidence such as disclosed by the record here, and the fact that awards larger than the one here involved have been sustained in this state for negligent death alone, as evidenced by the following cases: *Hale* v. *San Bernardino etc. Co., supra,* where the award was twelve thousand dollars, and *McGrory* v. *Pacific Electric Ry. Co.,* 22 Cal. App. 671, [136 Pac. 303], where the award was twenty thousand dollars, I do not feel, in the face of the record here, that we should disturb the verdict of the jury or the order denying defendants' motion for a new trial, which was the conclusion of the learned trial judge, who appears to have been extremely careful and who has conducted himself on the trial of this case in such a way as to be worthy of emulation by every trial judge in the land.

I think the appeal from the order denying defendants' motion for a new trial should be dismissed and the judgment appealed from affirmed.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 9, 1919.

All the Justices concurred, except Melvin, J., who was absent.